PAUL E. WATKINS, D.D.S., Petitioner v. NORTH CAROLINA STATE BOARD OF DENTAL EXAMINERS, Respondent

No. 301A03

(Filed 2 April 2004)

**1. Dentists— orthodontist—standard of care—absence of expert testimony**

The North Carolina State Board of Dental Examiners was authorized to determine the appropriate standard of care for petitioner orthodontist's treatment of a patient without expert testimony from an orthodontist, because: (1) there is no per se rule

that expert testimony is required to establish the standard of care in disciplinary hearings conducted by professional licensing boards; (2) the fact that the General Assembly did not see fit to make any special provisions for disciplinary actions involving orthodontists suggests that it deemed the standards of care governing the practice of orthodontics to be within the ken of licensed dentists; and (3) a licensee is not denied meaningful judicial review when a licensing board cannot base its findings or conclusions on facts outside the record but has a statutory obligation to reach a reasoned decision based on substantial evidence in view of the entire record.

**2. Dentists— orthodontist—suspension of license—failure to follow timely treatment plan—failure to take patient photographs**

A whole record review revealed that substantial evidence supported the State Board of Dental Examiners' decision to suspend the dental license of petitioner orthodontist based upon its findings and conclusions that petitioner breached the standard of care for orthodontists by failing to establish and follow a treatment plan which would address the orthodontic needs of two patients in a timely manner and by failing to take any intraoral and facial photographs of one of those patients because: (1) the Board could reasonably have concluded that petitioner's delay in initiating treatment, his decision to pursue an initial policy of therapeutic nonextraction, and his eventual decision to extract unilaterally on one side of a patient's mouth all contributed to an unreasonable delay in one patient's progress as an orthodontic patient; (2) it fell within the province of the Board to determine whether the delay in a patient's treatment was attributable to a flawed treatment plan or to patient noncompliance; (3) an expert testified that petitioner initially adopted a course of treatment for the second patient that had no chance of success and that his actual course of treatment of this patient failed to correct the patient's orthodontic problems in a timely manner; (4) assuming that intraoral and facial photographs have no value as a diagnostic tool, the Board could reasonably have concluded that the standard of care requires their use as a means to track the progress of orthodontic care; and (5) the absence of testimony concerning the relative advantages of photographs over other diagnostic tools goes only to the weight of an expert's testimony which is a matter for the Board to decide, and the fact that a

learned treatise does not list photographs among the minimum required diagnostic records is not dispositive as to the standard of care.

**3. Dentists— orthodontist—refusal of treatment—outstanding balance on patient account—negligence in practice of dentistry**

A de novo review revealed that the Board of Dental Examiners did not err by concluding that petitioner orthodontist's refusal to treat a patient due to nonpayment constituted negligence in the practice of dentistry under N.C.G.S. § 90-41(a)(12), because: (1) although it is not dispositive, the North Carolina State Board of Dental Examiners' construction of the statutory term "practice of dentistry" under N.C.G.S. § 90-41(a)(12) to encompass the refusal to see or treat a patient is persuasive authority for our Supreme Court; (2) it is reasonable in the present case to characterize petitioner's refusal to see or treat a patient as a facet of his management, supervision, control, or conduct of his dental practice under N.C.G.S. § 90-29(b)(11); (3) the Dental Practice Act was intended to guard against threats to public health, and a dentist's refusal to treat a patient due to nonpayment may directly and adversely affect a patient's health; and (4) a telephone call from a patient expressing a desire to discontinue treatment does not terminate the dentist-patient relationship, but instead it continues until a patient is formally released by the dentist.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 157 N.C. App. 367, 579 S.E.2d 510 (2003), affirming a judgment signed 5 April 2002, by Judge David Q. LaBarre in Superior Court, Wake County. Heard in the Supreme Court 17 November 2003.

*The Charleston Group, by Freddie Lane, Jr., for petitioner-appellee.*

*Ellis & Winters, L.L.P., by Paul K. Sun, Jr.; and Bailey & Dixon, L.L.P., by M. Denise Stanford, for respondent-appellant.*

*Allen & Pinnix, P.A., by Noel L. Allen and Angela Long Carter, on behalf of North Carolina State Board of Certified Public Accountant Examiners and North Carolina Board of Architecture, amici curiae.*

*North Carolina Medical Board, by Amy Yonowitz and Marcus Jimison, amicus curiae.*

*Howard A. Kramer, on behalf of North Carolina Board of Nursing, amicus curiae.*

*Womble, Carlyle, Sandridge & Rice, P.L.L.C., by Johnny M. Loper, on behalf of North Carolina State Board of Examiners in Optometry, amicus curiae.*

*Young, Moore & Henderson, P.A., by John N. Fountain, on behalf of North Carolina State Board of Examiners of Electrical Contractors and North Carolina State Board of Examiners of Plumbing, Heating, and Fire Sprinkler Contractors, amici curiae.*

*North Carolina State Board of Examiners for Engineers and Surveyors, by David S. Tuttle, amicus curiae.*

MARTIN, Justice.

Petitioner, Paul E. Watkins, is a dentist licensed to practice dentistry in North Carolina who limits his practice in this state[1] to the specialty area of orthodontics. Based on formal complaints initiated by three of petitioner's patients—John Casto, Conrad Naico, and Sabrina Wolfe—the North Carolina Board of Dental Examiners (Dental Board or the Board) held an administrative hearing to determine if petitioner had violated applicable provisions of the Dental Practice Act, N.C.G.S. § 90-22 to 90-48.3 (2003). The evidence presented at the hearing included documentary evidence as well as lay and expert testimony. On 18 July 2001, the Board issued its final agency decision, concluding that petitioner's failure to comply with the applicable standards of care in his treatment of all three patients constituted negligence in the practice of dentistry within the meaning of N.C.G.S. § 90-41(a)(12) (2003). Accordingly, the Board ordered that petitioner's license be suspended for a period of six months, with conditional restoration subject to petitioner's adherence to probationary terms.

Petitioner sought judicial review of the Board's order in Wake County Superior Court. By judgment signed 5 April 2002, the trial court reversed and remanded to the Board for reinstatement of peti-

---

1. Petitioner is also licensed in New York, where he practices general dentistry.

tioner's license. The trial court concluded that the Board's determination that petitioner was negligent in the practice of dentistry was unsupported by substantial, material, and competent evidence in view of the entire record and, therefore, that the suspension of petitioner's license was arbitrary and capricious. A divided panel of the Court of Appeals affirmed, and respondent appealed to this Court as a matter of right. We reverse.

I.

[1] The first issue presented is whether the Board was authorized, under *Leahy v. North Carolina Bd. of Nursing*, 346 N.C. 775, 488 S.E.2d 245 (1997), to determine the appropriate standard of care for petitioner's treatment of patient John Casto (Casto) without expert testimony from an orthodontist.

At the outset, we note that this issue does not encompass the Board's consideration of petitioner's treatment of Sabrina Wolfe (Wolfe) and Conrad Naico (Naico). With respect to Wolfe and Naico, Board experts testified as to the requisite standards of care in addition to offering their expert opinions that petitioner had breached those standards. With regard to Casto, on the other hand, the Board's expert witness, Dr. Christopher Trentini, testified that Casto's progress "was behind schedule, clearly" given the nature of Casto's orthodontic problems and the length of time he had been in treatment. Dr. Trentini did not testify that the standard of care for orthodontists practicing in North Carolina required a more timely resolution of Casto's orthodontic problems. Nevertheless, after reviewing the dental records and the expert and lay testimony presented, the Board found that the standard of care for dentists licensed to practice in North Carolina "required an orthodontist to establish and follow a treatment plan which would address the patient's orthodontic needs in a timely manner." The Board also found that petitioner "violated the standard of care . . . by failing to establish and follow a treatment plan that would address the patient's orthodontic needs in a timely manner." The Board concluded that petitioner's failure to comply with the applicable standard of care in his treatment of Casto was a "dereliction from professional duty constituting negligence in the practice of dentistry within the meaning of N.C.G.S. § 90-41(a)(12)."

Petitioner argues that given the absence of expert testimony as to the appropriate standard of care and breach thereof, the Board lacked substantial evidence to support its conclusion that petitioner's

treatment of Casto constituted negligence in the practice of dentistry. This argument, however, is foreclosed by our holding in *Leahy*, which we now reaffirm.

*Leahy* involved a disciplinary action by the North Carolina Board of Nursing (Nursing Board) against a registered nurse (the petitioner or Leahy) concerning her treatment of two patients. *Leahy*, 346 N.C. 775, 488 S.E.2d 245. At that hearing before the Nursing Board, four nurses presented eyewitness testimony as to the factual details of the conduct at issue. *Id.* at 776-77, 488 S.E.2d at 245-46. They did not, however, testify as to the requisite standard of care for registered nurses. *Id.* The Nursing Board found facts consistent with the eyewitnesses' testimony and concluded that Leahy's treatment of the two patients breached the requisite standard of care in violation of the Nursing Practice Act. *Id.* at 778, 448 S.E.2d at 247. Relying on our holding in *Dailey v. North Carolina State Bd. of Dental Exam'rs*, 309 N.C. 710, 309 S.E.2d 219 (1983), the Court of Appeals reversed, holding that the Board's suspension of the petitioner's license was improper because of the absence of expert testimony defining the standard of care for registered nurses in the practice of their profession. *Leahy*, 346 N.C. at 780, 488 S.E.2d at 248.

We reversed the Court of Appeals, rejecting the argument that expert testimony was required to establish the applicable standard of care. *Leahy*, 346 N.C. at 780-81, 488 S.E.2d at 248. In reaching this decision, we turned to North Carolina's Administrative Procedure Act (APA), which expressly provides that "[a]n agency may use its experience, technical competence, and specialized knowledge in the evaluation of evidence presented to it." *Id.* (quoting N.C.G.S. § 150B-41(d) (1995)). We concluded that the specialized knowledge of the Nursing Board "includes knowledge of the standard of care for nurses," and thus that the Nursing Board was entitled to use this knowledge in evaluating the evidence before it. *Id.* at 781, 488 S.E.2d at 248. In support of this conclusion, we looked to the composition and statutorily prescribed functions of the Nursing Board, noting that it (1) consisted of nine registered nurses, four licenced practical nurses, one retired doctor, and one layperson; (2) was authorized by statute to develop rules and regulations to govern medical acts by registered nurses; (3) was empowered to administer, interpret, and enforce the Nursing Practice Act; and (4) was required by statute to establish the qualifications and criteria for licensure of nurses. *Id.* Reasoning that "[t]o meet these requirements, the [Nursing] Board must know the standard of care for registered nurses in this state," we held that the

Court of Appeals had erred in requiring expert testimony to establish that standard. *Id.*

*Leahy* illustrates the deference that courts accord to administrative bodies in the exercise of their factfinding functions. *See, e.g., In re Berman*, 245 N.C. 612, 616-17, 97 S.E.2d 232, 236 (1957). We acknowledge that, in a medical malpractice action, the standard of care is normally established by the testimony of a qualified expert. *Jackson v. Mountain Sanitarium & Asheville Agric. Sch.*, 234 N.C. 222, 226-27, 67 S.E.2d 57, 61 (1951). This general rule is based on the recognition that in the majority of cases the standard of care for health providers concerns technical matters of "highly specialized knowledge," and a lay factfinder is "dependent on expert testimony" to fairly determine that standard. *Id.* This rationale is not necessarily controlling within the context of disciplinary proceedings conducted by professional licensing boards where, as here, the factfinding body is composed entirely or predominantly of experts charged with the regulation of the profession. *See Arlen v. State Med. Bd.*, 61 Ohio St. 2d 168, 174, 399 N.E.2d 1251, 1255 (1980). Thus, we decline to impose a *per se* rule that expert testimony is required to establish the standard of care in disciplinary hearings conducted by professional licensing boards.

Petitioner contends that *Leahy* is distinguishable in light of the relative compositions of the Dental and Nursing Boards. In *Leahy*, petitioner argues, the Nursing Board was competent to establish the standard of care for registered nurses without the benefit of expert testimony because, by statute, at least eight of its fifteen members must be registered nurses. N.C.G.S. § 90-171.21(a) (2003). In the present case, by contrast, the Dental Practice Act does not mandate that any orthodontists serve on the Board, *see* N.C.G.S. § 90-22(b) (2003), and at the time petitioner's case came on for hearing, none did. Thus, petitioner argues, the Board lacked the requisite expertise, technical training, and specialized knowledge to determine the standard of care for orthodontists. For the following reasons, we reject this argument and hold that *Leahy* controls our resolution of the present case.

The Dental Practice Act vests the Board with broad authority to regulate the practice of dentistry, including the powers to grant or revoke a license and to enact rules and regulations governing the profession. N.C.G.S. §§ 90-41(a), 90-48 (2003). Moreover, the General Assembly has clearly defined the "practice of dentistry" to encompass the practice of orthodontics. *Compare* N.C.G.S. § 90-29(b)(5)

(2003) (defining the "practice of dentistry" to include "[c]orrect[ing] the malposition or malformation of human teeth") *with* Oxford English Dictionary, Supplement and Bibliography (1961) (defining "orthodontia" as "[t]he correcting of irregular and faulty positions of the teeth"). There are no distinct licensure requirements for orthodontists in this state, and orthodontists—like all licensed dentists—are subject to the regulatory and disciplinary authority of the Dental Board as it is statutorily composed. *See* N.C.G.S. §§ 90-29(a), 90-41(a). By statute, the Board is composed of six licensed dentists, one dental hygienist, and one layperson. *See* N.C.G.S. § 90-22(a). There is no statutory requirement of orthodontic representation on the Board. *Id.* Thus, in the statutory scheme adopted by the legislature, orthodontists are regulated as dentists, by dentists. Although they practice in a specialty area within their profession, orthodontists are held accountable to the same disciplinary authority under the same statutory provisions as their peers who practice general dentistry.

Moreover, the Dental Practice Act specifically precludes the dental hygienist and lay members of the Board from participating in any matter involving the issuance, renewal, or revocation of a license to practice dentistry. N.C.G.S. § 90-22(b). This express exclusion of the two members who are not licensed dentists strongly suggests that the General Assembly gave due consideration to the competence of the Board as composed to adjudicate disciplinary matters. Under these circumstances, the fact that the General Assembly did not see fit to make any special provisions for disciplinary actions involving orthodontists suggests that it deemed the standards of care governing the practice of orthodontics to be within the ken of licensed dentists. In deference to this legislative judgment, we will not engraft a rule requiring expert testimony on the regulatory scheme devised by the General Assembly.

Petitioner asserts that liberal application of *Leahy* effectively vests professional licensing boards with "unfettered discretion" to revoke or deny a license, thereby rendering a licensee's statutory right to judicial review meaningless. We disagree. Far from undermining a licensee's right to have the merits of his or her case determined on the basis of facts in evidence, *Leahy* reaffirms that right as it was previously articulated in *Dailey.*

The APA provides that in all contested cases, an agency must base its findings of fact exclusively on evidence presented and facts officially noticed, all of which must be made a part of the offi-

cial record for purposes of judicial review. N.C.G.S. §§ 150B-41(b), 150B-42(a)-(b), 150B-47 (2003). In *Dailey*, we emphasized that the preservation of a record for judicial review was a "cornerstone of the Administrative Procedure Act" in that it enables a reviewing court to determine whether an agency, including a professional licensing board, has engaged in a "reasoned evaluation and analysis of [the] evidence presented." 309 N.C. at 724, 309 S.E.2d at 227. We further stated that while a licensing board " 'may put its expertise to use in evaluating the complexities of technical evidence,' " it " 'may not use its expertise as a substitute for evidence in the record.' " *Id.* (quoting *Arthurs v. Board of Registration in Med.*, 383 Mass. 299, 310, 418 N.E.2d 1236, 1244 (1981)).

*Leahy* in no way derogates from this aspect of our reasoning in *Dailey*. As we clarified in *Leahy*, "[t]he concern in *Dailey* was that the board would use its own expertise to decide the case *without any evidence to support it.*" *Leahy*, 346 N.C. at 780, 488 S.E.2d at 248 (emphasis added). In *Leahy*, however, "there [was] evidence in the record which the Board could use its expertise to interpret," including eyewitness testimony describing the petitioner's conduct. *Id.* We upheld the revocation of the petitioner's license in *Leahy* because we determined that (1) the Nursing Board was entitled to use its expertise in interpreting the evidence presented and (2) that expertise included knowledge of the standard of care for nurses. *Id.* at 780-81, 488 S.E.2d at 248. The petitioner's right to meaningful judicial review was preserved because "[f]rom the record, we [were] able to determine the validity of the Board's action." *Id.* at 780, 488 S.E.2d at 248.

*Leahy* overruled *Dailey* to the extent that *Dailey* implied the standard of care in licensing board cases must be established by expert testimony. *Leahy*, 346. N.C. at 781, 488 S.E.2d at 249. Under *Leahy*, where knowledge of the requisite standard of care must be within the board's specialized knowledge and expertise, the board may apply the appropriate standard even "if no evidence of it is introduced." *Id.* *Leahy* does not, however, empower a licensing board to base its findings or conclusions on facts outside the record. *See Sibley v. North Carolina Bd. of Therapy Exam'rs*, 151 N.C. App. 367, 378-79, 566 S.E.2d 486, 492-93 (2002) (Greene, J., dissenting) (citing *Leahy* for the proposition that board findings "must be based on the evidence and cannot merely rest on the Board's expertise with respect to the practice of physical therapy"), *rev'd per curiam for the reasons stated in the dissent*, 357 N.C. 42, 577 S.E.2d 622 (2003). Nor

does *Leahy* excuse an agency from its statutory obligation to reach a reasoned decision based on "substantial evidence . . . in view of the entire record." N.C.G.S. § 150B-51(b)(5) (2003). Accordingly, *Leahy* does not undermine a licensee's right to seek meaningful judicial review of the Board's decision.

## II.

[2] The next issue presented is whether there was substantial evidence in the record to support the Board's findings of fact and conclusions of law with respect to petitioner's treatment of Casto and Naico.

Judicial review of the final decision of an administrative agency in a contested case is governed by section 150B-51(b) of the APA. N.C.G.S. § 150B-51(b). When the issue for review is whether an agency's decision was supported by substantial evidence in view of the entire record, N.C.G.S. § 150B-51(b)(5), a reviewing court must apply the "whole record" test. *Mann Media, Inc. v. Randolph Cty Planning Bd.*, 356 N.C. 1, 13, 565 S.E.2d 9, 17 (2002); *In re Gordon*, 352 N.C. 349, 352, 531 S.E.2d 795, 797 (2000). A court applying the whole record test may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter *de novo*. *Elliot v. North Carolina Psychology Bd.*, 348 N.C. 230, 237, 498 S.E.2d 616, 620 (1998) (citing *Thompson v. Wake Cty Bd. of Educ.*, 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977)); *Boehm v. North Carolina Bd. of Podiatry Exam'rs*, 41 N.C. App. 567, 569, 255 S.E.2d 328, 330 (1979), *cert. denied*, 298 N.C. 294, 259 S.E.2d 298 (1979). Rather, a court must examine all the record evidence—that which detracts from the agency's findings and conclusions as well as that which tends to support them—to determine whether there is substantial evidence to justify the agency's decision. *Elliot*, 348 N.C. at 237, 498 S.E.2d at 620 (citing *Thompson*, 292 N.C. at 410, 233 S.E.2d at 541). "Substantial evidence" is defined as "relevant evidence a reasonable mind might accept as adequate to support a conclusion." N.C.G.S. § 150B-2(8b) (2003); *State ex rel. Comm'r of Ins. v. North Carolina Fire Ins. Rating Bureau*, 292 N.C. 70, 80, 231 S.E.2d 882, 888 (1977).

We first examine the sufficiency of the evidence to support the Board's findings and conclusions regarding Casto. Casto, a minor child, first presented to petitioner's office on 22 April 1996. Petitioner diagnosed Casto as having a Class I malocclusion, "severely crowded locked out maxillary bicuspids, and severely crowded mandibular

anterior incisors." Dental molds revealed that Casto presented to petitioner with a "midline deviation" of two millimeters. Petitioner devised a treatment plan of "therapeutic nonextraction," which called for the initial use of orthodontic appliances with possible future extractions of the upper and lower right first bicuspids.

Petitioner did not initiate Casto's treatment until four months later, on 26 August 1996. Although petitioner's office informed Casto's mother (Ms. Casto) that it was awaiting notification of Casto's Medicaid approval during this period, petitioner admits that his office never actually submitted the case to Medicaid.

On 22 October 1997, petitioner referred Casto for the extraction of his upper and lower right first bicuspids and continued treatment with orthodontic appliances. In the spring of 1998, after nearly two years of treatment, Ms. Casto became dissatisfied with her son's progress under petitioner's care and demanded an estimate of how much additional time Casto's treatment would require. Petitioner estimated that Casto would require an additional year of treatment. After petitioner's office cancelled three consecutive appointments for various reasons in August 1998, Ms. Casto consulted her general dentist for a referral to a different orthodontist.

That orthodontist, Dr. Trentini, testified at petitioner's hearing as an expert witness for the Board. Dr. Trentini testified that based on his initial consultation and a review of Casto's records, Casto would require an additional eighteen months of treatment. He also testified that Casto's treatment was "behind schedule, clearly" at the time Casto first presented to his office and that petitioner's decision to pursue unilateral extractions on the right side only of Casto's mouth had worsened Casto's preexisting midline deviation in violation of the applicable standard of care. In a letter addressed to the Board and entered into evidence at petitioner's hearing, Dr. Trentini further stated that in his opinion "[Casto's] treatment prior to transferring was significantly delayed relative to his time in treatment."

In light of these facts, the Board found that petitioner had breached the requisite standard of care for orthodontists by failing to establish and follow a treatment plan which would address Casto's orthodontic needs "in a timely manner." The Board concluded that this breach of the requisite standard of care constituted negligence in the practice of dentistry within the meaning of N.C.G.S. § 90-41(a)(12).

Having reviewed the whole record, we cannot say that the Board's finding that petitioner failed to treat Casto "in a timely manner" was unsupported by substantial evidence. Although the Board did not receive expert testimony specifically stating that the standard of care for dentists practicing orthodontics requires "timeliness" in the treatment of patients, the Board was entitled under *Leahy* to apply its expert knowledge of this standard of care to the facts before it, even if "no evidence of [the standard of care was] introduced." *Leahy*, 346 N.C. at 781, 488 S.E.2d at 249. In the present case, the Board could reasonably have concluded that petitioner's delay in initiating treatment, his decision to pursue an initial policy of "therapeutic nonextraction," and his eventual decision to extract unilaterally on one side of the mouth all contributed to an unreasonable delay in Casto's progress as an orthodontic patient.

In his brief, petitioner suggests that any delay in Casto's treatment resulted from either patient noncompliance or appliance breakage that cannot be attributed to negligence on petitioner's part. Petitioner cites no record evidence in support of this contention. Nonetheless, the record does reflect that petitioner regularly instructed his patients not to chew on hard foods or objects to avoid breaking brackets. Moreover, Casto admits that on at least one occasion he broke a bracket by chewing on a pen in contravention of petitioner's instructions.

We agree that this evidence tends to detract from the Board's findings that any delay in Casto's treatment was attributable to petitioner's negligence, and we encompass this evidence within our review of the whole record. We note, however, that the Board was also presented with evidence that tends to undermine petitioner's "broken bracket" defense. First, Casto and his mother both testified that Casto's brackets often came loose immediately or shortly after placement, suggesting that improper placement, not patient noncompliance, was the cause of the problem. Second, Dr. Trentini testified that it was his practice to repair broken brackets at a patient's regularly scheduled appointment, in addition to completing any previously scheduled work. Petitioner, on the other hand, repaired broken brackets at a patient's regularly scheduled appointment but typically rescheduled for any previously scheduled work, thus necessarily extending the course of treatment. Finally, Dr. Trentini testified that Casto had only one "loose" bracket in nineteen months of treatment with him. By comparison, petitioner's treatment records for Casto reflect at least five broken brackets over the course of twenty-one months.

In cases appealed from an administrative tribunal, it is the responsibility of the administrative body, not a reviewing court, "to determine the weight and sufficiency of the evidence and the credibility of the witnesses, to draw inferences from the facts, and to appraise conflicting and circumstantial evidence." *State ex rel. Comm'r of Ins. v. North Carolina Rate Bureau*, 300 N.C. 381, 406, 269 S.E.2d 547, 565 (1980). Thus, it fell within the province of the Board to determine whether the delay in Casto's treatment was attributable to a flawed treatment plan, as Dr. Trentini testified, or to patient noncompliance, as petitioner alleges. To the extent the evidence diverges, we defer to the Dental Board's resolution of any conflicts. On the basis of the record before us, we cannot conclude that the Board lacked "relevant evidence a reasonable mind might accept as adequate," N.C.G.S. § 150B-2(8b), to support its conclusion that petitioner's treatment of Casto was untimely and that such untimeliness was a breach of the requisite standard of care for dentists practicing orthodontics in North Carolina.

We now turn to the sufficiency of the evidence to support the Board's findings and conclusions concerning Naico.

Naico, a minor child, first presented at petitioner's office on 5 December 1996, seeking treatment for an overbite and gaps in his teeth. Petitioner diagnosed Naico as having a class II malocclusion, one hundred percent overbite, and four to six millimeter overjet. Prior to initiating treatment, petitioner took records, including a panorex radiograph, cephalometric radiograph, and trimmed study models. Petitioner admits, however, that he did not take intraoral or facial photographs.

Petitioner's initial treatment plan called for the use of a biteplate and orthodontic braces, and a Medicaid pre-authorization form indicated a twenty-four month course of treatment. In May 1998, however, petitioner informed Naico's mother (Ms. Naico) that Naico's treatment would require extraction of the upper first premolars. On 26 May 1998, after nine months of treatment, petitioner referred Naico to a general dentist for these extractions. A year later, after twenty-one months of treatment, petitioner became concerned that Naico's case "was progressing probably in less than an ideal way" and began considering other possible treatment options, including further extractions and oral surgery. Dissatisfied with the progress her son had made in petitioner's care, and alarmed at the prospect of further extractions when the gaps in Naico's teeth were not being closed, Ms. Naico discontinued treatment with petitioner in May 1999.

At petitioner's hearing, the Board presented the expert testimony of Dr. James Kaley, an orthodontist. Dr. Kaley testified that the standard of care for dentists licensed to practice in North Carolina requires an orthodontist to take intraoral and facial photographs prior to initiating treatment and that petitioner breached this standard of care in his treatment of Naico. Dr. Kaley stated that petitioner's treatment plan was inappropriate in that it failed to correct Naico's orthodontic problems in a timely manner. Specifically, Dr. Kaley testified that petitioner's initial treatment plan would never have corrected Naico's orthodontic problems, that this should have been evident to petitioner from the beginning, and that the standard of care required petitioner to recommend either surgery or the use of a Herbst appliance as the appropriate treatment plan for Naico at the outset. Dr. Kaley also testified that petitioner's treatment plan failed to address several of Naico's orthodontic problems, including a missing lower left central incisor and angled left second molar. Dr. Kaley stated that with a proper diagnosis and treatment, Naico's treatment could have been completed within two to two-and-a-half years. With petitioner's treatment plan, however, Dr. Kaley did not believe that a satisfactory result could be reached "regardless of time."

Based on the testimony and physical evidence presented at the hearing, the Board found that petitioner breached two applicable standards of care with respect to Naico. First, the Board found that the standard of care for dentists licensed to practice in North Carolina requires an orthodontist "to take, or have available, intraoral and facial photographs prior to initiating orthodontic treatment" and that petitioner breached this standard of care by failing to include such photographs in Naico's treatment records. Second, the Board found that petitioner breached the requisite standard of care for dentists licensed to practice in North Carolina by failing "to formulate an appropriate treatment plan to remedy the problems diagnosed in a timely manner."

Petitioner disputes both of these findings. First, petitioner argues that notwithstanding Dr. Kaley's testimony, the Board lacked substantial evidence to support its finding that petitioner's failure to include intraoral or facial photographs in Naico's treatment records breached an applicable standard of care. In support of this contention, petitioner asserts that photographs are not necessary for a proper diagnosis, as they do not show anything that cannot be observed with the naked eye. Petitioner also alleges that a leading treatise on orthodontic care does not list intraoral or facial pho-

tographs as a necessary diagnostic tool. Finally, petitioner contends that because Dr. Kaley's testimony did not address the comparative value of photographs over the diagnostic tools petitioner did employ, Dr. Kaley's testimony does not constitute substantial evidence in support of the Board's findings.

After careful review of the record, we cannot say that the Board lacked a reasonable basis for its decision. Dr. Kaley testified that photographs are useful both in initial diagnosis and to record a patient's initial condition for later reference. Thus, even assuming intraoral and facial photographs have no value as a diagnostic tool, the Board could reasonably have concluded that the standard of care requires their use as a means to track the progress of orthodontic care. Moreover, the absence of testimony concerning the relative advantages of photographs over other diagnostic tools goes only to the weight of Dr. Kaley's testimony, which is a matter for the Board to decide. *See State ex rel. Comm'r of Ins.*, 300 N.C. at 406, 269 S.E.2d at 565. Similarly, the fact that a learned treatise does not list photographs among the minimum required diagnostic records is not dispositive as to the standard of care. The Board was certainly entitled to reject petitioner's allegations in light of Dr. Kaley's testimony. *See id.*

Next, petitioner contends that Dr. Kaley's testimony about the timeliness of petitioner's treatment of Naico is insufficient to establish the requisite standard of care. Petitioner argues that Dr. Kaley offered his opinion regarding the preferred treatment plans for Naico's orthodontic problems, not his understanding of what the statewide minimum level of competency requires. This argument, however, mischaracterizes Dr. Kaley's testimony. Although Dr. Kaley did testify that his "personal preference" would have been to treat Naico with a Herbst appliance, he also testified that petitioner's actual course of treatment failed to correct Naico's orthodontic problems in a timely manner in violation of the applicable standard of care. Specifically, Dr. Kaley stated that petitioner's failure to treat Naico *either* with surgery *or* with a Herbst appliance resulted in petitioner's initial adoption of a treatment plan with no chance of success. From this evidence, the Board could reasonably have concluded that petitioner failed to conform to a statewide level of minimum competency applicable to all dentists practicing orthodontics in North Carolina. Thus, the Board's findings are supported by substantial evidence in view of the entire record and are binding on appeal.

## III.

**[3]** The final issue presented is whether the Board erred as a matter of law in concluding that petitioner's refusal to treat Wolfe due to nonpayment constituted "negligen[ce] in the practice of dentistry" within the meaning of N.C.G.S. § 90-41(a)(12).

Wolfe, a minor child, first presented to petitioner's office on 24 January 1996, complaining of crooked and crowded teeth. Petitioner diagnosed Wolfe as having a Class I malocclusion, "severely crowded with overlapping of the maxillary central incisors and mandibular anterior crowding," and proposed a treatment plan requiring the extraction of four bicuspids following the initial use of orthodontic appliances. Between August 1996 and July 1997, petitioner saw Wolfe in his office on eight occasions, during which time he took records, placed separators, and finally placed orthodontic bands and wires in Wolfe's mouth. Petitioner delayed the proposed extractions while awaiting Medicaid approval of Wolfe's case.

On 12 August 1997, eleven days after Wolfe's Medicaid claim was denied, Wolfe's mother (Ms. Wolfe) consented to pay for petitioner's orthodontic services, and Wolfe was referred to a general dentist for the extraction of four teeth. By the terms of the written guarantor contract, Ms. Wolfe agreed to make thirty-five installment payments on the first of each month. On 8 October 1997, Wolfe arrived for a scheduled appointment and was advised that she would have to reschedule due to nonpayment. Wolfe rescheduled for 30 October 1997 and was seen on that day after making her October payment. On 26 November 1997, Wolfe was again sent away from a scheduled appointment due to nonpayment. Wolfe did not return to petitioner's office after this occasion.

At petitioner's hearing, a Dental Board investigator testified that petitioner had stated it was office policy to refuse treatment to patients who owed a balance on their accounts. Petitioner denied having such a policy, but admitted that Wolfe was twice denied treatment due to nonpayment. Dr. Numa Cobb, an orthodontist, testified as an expert witness for the Board concerning the standard of care for dentists licensed to practice in North Carolina. Dr. Cobb testified that the standard of care "very clearly" requires a dentist to continue to see an orthodontic patient even though there is an outstanding balance on his or her account. According to Dr. Cobb, the standard of care requires a dentist to continue treating a patient who is not making payments unless and until the dentist (1) sends the patient a let-

ter terminating the dentist-patient relationship and (2) provides the patient with an opportunity to find another orthodontist. Dr. Cobb further testified that petitioner's office "abandoned" Wolfe as a patient when Wolfe was refused treatment due to nonpayment and that this abandonment violated the requisite standard of care.

Based on the evidence presented, the Board found that the standard of care for dentists licensed to practice in North Carolina requires that "once orthodontic treatment is initiated, the dentist must continue to treat a patient with an outstanding balance until that patient has been formally dismissed by the practice and given a period of time to find another dentist to continue treatment." The Board concluded that petitioner violated this standard of care by refusing to treat Wolfe because of an outstanding balance on her account. The Board concluded that this violation of the applicable standard of care "was a dereliction from professional duty constituting negligence in the practice of dentistry within the meaning of N.C.G.S. § 90-41(a)(12)."

Petitioner argues, and the Court of Appeals held, that an orthodontist's rescheduling practices do not involve the "practice of dentistry," and thus petitioner cannot be disciplined under section 90-41(a)(12) of the Dental Practice Act. *Watkins*, 157 N.C. App. at 374, 579 S.E.2d at 515. According to petitioner and the Court of Appeals majority, an orthodontist's questionable rescheduling practices are more appropriately viewed as "unprofessional conduct," bringing such practices within the purview of section 90-41(a)(26). *Id.* at 374-75, 579 S.E.2d at 515 (2003). Section 90-41(a)(26) of the Dental Practice Act provides that the Board may revoke or suspend the license of a dentist who "[h]as engaged in any unprofessional conduct as the same may be, from time to time, defined by the rules and regulations of the Board." N.C.G.S. § 90-41(a)(26). Because the Board's rules and regulations are silent with regard to rescheduling practices, petitioner argues, the Board lacked authority to discipline him for his refusal to treat Wolfe.

At the outset, we agree with petitioner that whether a dentist's refusal to treat a patient due to nonpayment constitutes "the practice of dentistry" or "unprofessional conduct" within the meaning of the applicable statute is a question of law subject to *de novo* review. *See Brooks v. McWhirter Grading Co.*, 303 N.C. 573, 580-81, 281 S.E. 2d 24, 29 (1981). We note, however, that the construction given to a statute by the administrative agency charged with the statute's enforcement is entitled to due consideration by a reviewing court.

*Faizan v. Grain Dealers Mut. Ins. Co.*, 254 N.C. 47, 57, 118 S.E.2d 303, 310 (1961); *see also Gill v. Board of Comm'rs of Wake Cty*, 160 N.C. 176, 188, 76 S.E. 203, 208 (1912). In the instant case, the Dental Board expressly concluded that petitioner's refusal to treat Wolfe due to nonpayment "was a dereliction from professional duty constituting negligence in the practice of dentistry within the meaning of G.S. § 90-41(a)(12)." Although it is not dispositive, the Board's construction of the statutory term the "practice of dentistry" to encompass the refusal to see or treat a patient is persuasive authority for this Court. *See Faizan*, 254 N.C. at 57, 118 S.E.2d at 310.

We also note that our primary task in construing a statute is to effectuate the intent of the legislature. *State ex rel. Comm'r of Ins.*, 300 N.C. at 399, 269 S.E.2d at 561; *In re Beatty*, 286 N.C. 226, 229, 210 S.E.2d 193, 195 (1974). We have previously identified the "best indicia of . . . legislative purpose" to be " 'the language of the statute, the spirit of the act, and what the act seeks to accomplish.' " *State ex rel. Comm'r of Ins.*, 300 N.C. at 399, 269 S.E.2d at 561 (quoting *Stevenson v. City of Durham*, 281 N.C. 300, 303, 188 S.E.2d 281, 283 (1972)).

Applying these principles, we turn first to the language of the Dental Practice Act. Section 90-29(b) of the Dental Practice Act enumerates thirteen "acts or things" that constitute the "practice of dentistry." N.C.G.S. § 90-29(b). These "acts or things" include not only clinical procedures such as removing stains, extracting teeth, and correcting the malposition of teeth, *see* N.C.G.S. § 90-29(b)(2),(3),(5), but also broadly defined managerial and advertising practices, *see* N.C.G.S. § 90-29(b)(11),(12),(13). Specifically, subsection 90-29(b)(11) provides that a dentist is engaged in the "practice of dentistry" when he or she "[o]wns, manages, supervises, controls or conducts . . . any enterprise wherein any one or more of the [clinical] acts or practices set forth in subdivisions (1) through (10) above are done, attempted to be done, or represented to be done." N.C.G.S. § 90-29(b)(11). In the present case, it is reasonable to characterize petitioner's refusal to see or treat a patient as a facet of his management, supervision, control, or conduct of his dental practice. Thus, the language of the Act is amenable to the construction placed upon it by the Board.

In pursuing the next two prongs of our inquiry, the spirit and legislative goals of the Dental Practice Act, we need look no farther than the Act itself. The Dental Practice Act expressly declares that "the practice of dentistry . . . affect[s] the public health, safety, and wel-

fare," and is therefore "subject to regulation and control in the public interest." N.C.G.S. § 90-22(a). The Act further provides that it "shall be liberally construed to carry out these objects and purposes." *Id.* In the instant case, we agree with the Board's assertion that a dentist's refusal to treat a patient due to nonpayment may directly and adversely affect a patient's health. This conclusion draws support from the expert testimony of Dr. Cobb, an orthodontist, who stated at petitioner's hearing that a patient in braces who does not receive follow-up treatment may experience "periodontal lesions, periodontal disease . . . loose bands, caries beneath the bands, loose brackets, loose wires, [and] wires going into the [t]issue." Because the Dental Practice Act was intended to guard against such threats to the public health, and because the Act is to be liberally construed to effectuate this purpose, a dentist's refusal to treat a patient may appropriately be characterized as the "practice of dentistry" as defined in N.C.G.S. § 90-29(b).

Petitioner also argues, however, that even if an orthodontist's refusal to see or treat a patient constitutes "the practice of dentistry," Wolfe had already "voluntarily terminated" the dentist-patient relationship. Petitioner notes that Wolfe was refused treatment on 8 October and 26 November 1997. In her complaint, however, Wolfe alleged that she "had contacted the office in August or September of '97 to tell them [she] did not want to see them anymore." Because Wolfe had terminated the dentist-patient relationship prior to the incidents complained of, petitioner contends, petitioner owed her no professional duty, and his refusal to treat her cannot constitute "negligence" in the practice of dentistry under section 90-41(a)(12).

The Court of Appeals found this argument persuasive and held that because Wolfe "was no longer a patient of record" at the time she was refused treatment, petitioner's failure to treat her could not constitute "negligence" under section 90-41(a)(12). *Watkins*, 157 N.C. App. at 375, 579 S.E.2d at 515. We disagree. Notwithstanding petitioner's allegations, the Board found as a fact that Wolfe was a patient of record at the time she was denied treatment due to nonpayment. Because this finding is supported by substantial evidence in view of the entire record, it is binding on appeal.

In her complaint, Wolfe stated that she contacted petitioner's office in August or September 1997 "to tell them [she] did not want to see them anymore because of financial reasons [and because she] wanted an office in High Point where [she] live[d]." Nevertheless,

Wolfe continued to receive orthodontic treatment from petitioner during October and November of that year. From this evidence, the Board could reasonably have concluded that Wolfe had merely expressed her desire to discontinue treatment with petitioner at some point in the future. Alternatively, the Board could reasonably have concluded that Wolfe had changed her mind about terminating the dentist-patient relationship. In any event, the Board possessed "relevant evidence a reasonable mind might accept as adequate," N.C.G.S. § 150B-2(8b), to support its conclusion that petitioner's refusal to treat Wolfe breached a duty to Wolfe and thus constituted negligence in the practice of dentistry under N.C.G.S. § 90-41(a)(12).

Moreover, Dr. Cobb testified at petitioner's hearing that a telephone call from a patient expressing a desire to discontinue treatment does not terminate the dentist-patient relationship. Instead, Dr. Cobb testified, the dentist-patient relationship continues until a patient is formally released by the dentist. The record contains no indication that petitioner formally dismissed Wolfe from his care prior to his refusal to treat her. Thus, the Board could reasonably have concluded that petitioner's professional duties to Wolfe survived any attempt on Wolfe's part to sever the professional relationship. Accordingly, the Board's determination that petitioner's refusal to treat Wolfe constituted "negligence" in the practice of dentistry is supported by substantial evidence in view of the entire record.

In conclusion, the Board acted within its authority in determining that petitioner had breached the applicable standard of care in his treatment of Casto. In addition, the Board's findings of fact and conclusions of law are supported by substantial competent evidence in view of the whole record. Finally, the Board properly concluded that petitioner's refusal to treat Wolfe because of an outstanding balance on her account constituted negligence in the practice of dentistry within the meaning of N.C.G.S. § 90-41(a)(12). Accordingly, the decision of the Court of Appeals is reversed and the case is remanded to the Court of Appeals for further remand to the trial court for entry of judgment affirming the Board's disciplinary order.

REVERSED AND REMANDED.