IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-436

Filed: 4 February 2020

Union County, No. 18 CVS 02286

PHILANDER INGRAM, COMMERCIAL CONTROLS, INC., Petitioners

v.

NORTH CAROLINA STATE BOARD OF PLUMBING, HEATING AND FIRE SPRINKLER CONTRACTORS, Respondent

Appeal by Petitioners from Order entered 6 February 2019 by Judge Lori I. Hamilton in Union County Superior Court. Heard in the Court of Appeals 17 October 2019.

*Vann Law Firm, P.A., by Christopher M. Vann, for petitioners-appellants.*

*Young Moore and Henderson, P.A., by Reed N. Fountain and John N. Fountain, for respondent-appellee.*

HAMPSON, Judge.

**Factual and Procedural Background**

Philander Ingram (Ingram) and Commercial Controls, Inc. (collectively Petitioners) appeal from the trial court's Order affirming an Order of the State Board of Plumbing, Heating and Fire Sprinkler Contractors suspending Petitioners' licenses for twenty-four months followed by twelve months of supervised probation. The Record reflects the following relevant facts:

Petitioners are engaged in the business of HVAC contracting. In 2004, Ingram received a residential license for HVAC contracting and in 2005 supplemented that license with a Heating Group 3, Class I License, which authorized additional residential and light commercial HVAC work. Ingram holds those licensees in the name of Commercial Controls, Inc. From 1 January 2013 to 31 December 2015, Petitioners were on probation due to a prior decision from the State Board of Plumbing, Heating and Fire Sprinkler Contractors. Two separate incidents gave rise to the appeal before us.

Beginning in December 2014, Petitioners entered into two contracts with a general contractor as part of a restaurant renovation of "The Cooking Pot" in Charlotte, North Carolina. Petitioners were subcontracted to install an exhaust hood system for the commercial kitchen and separately to install a complete duct system for the preexisting HVAC system, to service the dining area, and to install a new, four-ton HVAC system to service the restaurant's kitchen. The total contracted amount between Petitioners and the general contractor was $49,995.

Petitioners, utilizing the building's original load calculations, installed a new HVAC unit onto a preexisting platform on the roof of the restaurant and connected it to the existing duct system. Petitioners hung the new hood in the kitchen but did not complete final installation. Petitioners received $24,500 from the general contractor for this work, but Ingram stated he "chose to not continue any more work until [he]

was paid in full as the contract dictated." After Petitioners walked away from The Cooking Pot project, the restaurant owner (Ms. Ikuru) hired additional contractors to finish the installations required to open her business. Ms. Ikuru averred that she began experiencing significant leakage from the roof after the installation of the new HVAC unit. Upon inspection, Ms. Ikuru was informed the leaks were the result of improper installation of the new HVAC unit. Subsequently, Ms. Ikuru filed a complaint with the North Carolina Licensing Board for General Contractors, who forwarded the complaint to the North Carolina State Board of Plumbing, Heating and Fire Sprinkler Contractors (the Board) around March 2016.

On 20 June 2017, another complaint was filed against Petitioners. Kathy Melton, the City of Shelby Building Inspection Department's Administrative Assistant, averred that on 13 June 2017, two men employed by Carolina Air attempted to get a permit on behalf of Petitioners for a project at 401 N. Morgan Street, Shelby, North Carolina, a property managed by White Oaks Manor. The men informed her that they were not on the payroll but "they get a 1099." Melton did not issue a permit at that time. Later that day, Ingram obtained the requested permit in person; however, no installation or work occurred at 401 N. Morgan Street.

On 11 January 2018, the Board issued a Notice of Hearing to Petitioners related to the two complaints. Specifically, the Notice of Hearing alleged: Petitioners' work at The Cooking Pot was incompetent in that they used the original load

calculations for the building rather than completing new ones, installed the new HVAC unit on an existing platform and "did not repair gaps in the flashing claiming that was not part of the installation[,]" failed to install equipment rails, pieced together curb caps that were not watertight, capped new gas and electric penetrations with a bucket, and did not complete the final hookup of the hood system. The Notice of Hearing alleged Petitioners' "arrangement with White Oaks Manor constitutes license peddling or aiding and abetting contracting without license, both of which are violations of the statutes and rules enforced by [the] Board, and violate [Petitioners'] probation . . . ."

The case was heard before the Board on 24 July 2018. At Petitioners' hearing, the Board received testimony from, among others: Ingram; Ms. Ikuru; Mr. Mumtaz, the general contractor from The Cooking Pot; Howard Longacre, an employee of Baker Roofing Company who was hired by the property management company of The Cooking Pot to inspect the roof; Jonathan Yerkes, a Field Investigator for the Board who investigated the complaint filed against Petitioners related to The Cooking Pot; and Kathy Melton, Administrative Assistant at the City of Shelby Building Inspections Department.

On 8 August 2018, the Board entered an Order (Board's Order) suspending Petitioners' licenses for twenty-four months to be followed by a twelve-month period of supervised probation. On 7 September 2018, Petitioners filed a Petition for

Judicial Review in Union County Superior Court. On 6 February 2019, the trial court entered an Order affirming the Board's Order. On 7 March 2019, Petitioners timely filed Notice of Appeal from the trial court's Order.

## Issues

Petitioners contend (I) the trial court incorrectly determined that the Board did not err when it affirmed the Board's determination that Petitioners' installation at The Cooking Pot was incompetent and (II) the trial court incorrectly determined the Board's decision was supported by substantial evidence.

## Standard of Review

> Appellate review of a judgment of the superior court entered upon review of an administrative agency decision requires that the appellate court determine whether the trial court utilized the appropriate scope of review and, if so, whether the trial court did so correctly. The nature of the error asserted by the party seeking review dictates the appropriate manner of review: if the appellant contends the agency's decision was affected by a legal error, *de novo* review is required[.]

*Dillingham v. N. C. Dep't of Human Res.*, 132 N.C. App. 704, 708, 513 S.E.2d 823, 826 (1999) (citation and quotation marks omitted). "When the issue for review is whether an agency's decision was supported by substantial evidence in view of the entire record, a reviewing court must apply the whole record test." *Watkins v. N.C. State Bd. of Dental Exam's*, 358 N.C. 190, 199, 593 S.E.2d 764, 769 (2004) (citations and quotation marks omitted). "A court applying the whole record test may not substitute its judgment for the agency's as between two conflicting views, even

though it could reasonably have reached a different result had it reviewed the matter *de novo.*" *Id.* (citation omitted). Accordingly, we review the trial court's Order first to determine if the trial court applied the correct standard of review to Petitioners' claims. We then review the trial court's Order for questions of law de novo and apply the whole-record test to determine if the trial court's decision affirming the Board is supported by substantial evidence.

## Analysis

### I. Petitioners' Alleged Incompetence

Petitioners contend the Board erred as a matter of law when it concluded Petitioners' work at The Cooking Pot was incompetent under N.C. Gen. Stat. § 87-23(a). Specifically, Petitioners contend the applicable regulation of the building code constitutes the minimum standard of competence and therefore Petitioners complied with the minimum standards of competence when the work passed inspection and, second, that Petitioners were not required by regulation to conduct an independent load calculation when installing the new HVAC unit. Petitioners' contentions are questions of law, which the trial court properly reviewed de novo. We also review Petitioners' contentions de novo. *See Dillingham*, 132 N.C. App. at 708, 513 S.E.2d at 826.

*A. Inspection*

Petitioners first contend the trial court erred in affirming the Board's conclusion Petitioners' work at The Cooking Pot was incompetent because "the provisions of the building code are the minimum standard of competence" and the "Board's investigator testified that the rooftop HVAC unit passed inspection." Petitioners further contend that for the Board to conclude Petitioners violated "standards prevailing in the industry[,]" expert testimony on the issue of "installing a four-ton rooftop heating and air conditioning unit" was necessary. The trial court concluded the Board was not required to receive expert testimony related to the "standards prevailing in the industry." We agree.

Our Supreme Court has considered similar issues regarding the necessity of expert testimony in hearings before professional licensing boards. In *Leahy v. N. C. Bd. of Nursing*, our Supreme Court reversed an unanimous Court of Appeals decision and held "[t]he knowledge of the [Nursing] Board includes knowledge of the standard of care for nurses. . . . There is no reason it should not be allowed to apply this standard if no evidence of it is introduced." 346 N.C. 775, 781, 488 S.E.2d 245, 248 (1997).

In its reasoning, the Court emphasized the language found in North Carolina's Administrative Procedure Act (APA), which states "[a]n agency may use its experience, technical competence, and specialized knowledge in the evaluation of evidence presented to it[,]" N.C. Gen. Stat. § 150B-41(d), and "the composition and

statutorily prescribed functions of the Nursing Board[.]" *Watkins*, 358 N.C. at 195, 593 S.E.2d at 767 (citing *Leahy*, 346 N.C. at 781, 488 S.E.2d at 248). In analyzing "the composition and statutorily prescribed functions" of the Nursing Board, the Court highlighted the Nursing Board:

> [C]urrently consists of nine registered nurses, four licensed practical nurses, one retired doctor, and one lay person. The Board is authorized to develop rules and regulations to govern medical acts by registered nurses. It is empowered to administer, interpret, and enforce the Nursing Practice Act. The Board is required to adopt standards regarding qualifications of applicants for licensure and to establish criteria which must be met by an applicant in order to receive a license.

*Leahy*, 346 N.C. at 781, 488 S.E.2d at 248 (citations omitted).

In *Watkins* our Supreme Court extended its *Leahy* analysis to the Dental Board and "declin[ed] to impose a *per se* rule that expert testimony is required to establish the standard of care in disciplinary hearings conducted by professional licensing boards." *Watkins*, 358 N.C. at 196, 593 S.E.2d at 767. The petitioner argued that the Dental Board was not qualified to opine on the standard of care applicable to orthodontists, who are licensed under the Dental Board. *Id.* at 194, 593 S.E.2d at 767. The Court, following *Leahy*, looked to the North Carolina APA and the "composition and statutorily prescribed functions" of the Dental Board. *Id.* at 195, 593 S.E.2d at 767. The *Watkins* Court determined "the Board is composed of six licensed dentists, one dental hygienist, and one layperson" and that the "Dental Practice Act vests the [Dental] Board with broad authority to regulate the practice of

dentistry, including the powers to grant or revoke a license and to enact rules and regulations governing the profession." *Id.* at 196-97, 593 S.E.2d at 768 (citations omitted).

The *Watkins* Court reasoned that although the standard of care for health providers in negligence cases is generally established by expert testimony that "rationale is not necessarily controlling within the context of disciplinary proceedings conducted by professional licensing boards where, as here, the factfinding body is composed entirely or predominantly of experts charged with the regulation of the profession." *Id.* at 196, 593 S.E.2d at 767. The Court concluded, "[u]nder *Leahy*, where knowledge of the requisite standard of care must be within the board's specialized knowledge and expertise, the board may apply the appropriate standard even if no evidence of [the standard of care] is introduced." *Id.* at 198, 593 S.E.2d at 769 (citation and quotation marks omitted). Accordingly, the Court held "the [Dental] Board acted within its authority in determining that petitioner had breached the applicable standard of care[.]" *Id.* at 209, 593 S.E.2d at 775.

Here, Petitioners contend expert testimony on the "manufacturers specifications and installation instructions and standards prevailing in the industry" was required for the Board to determine Petitioners violated those standards. We disagree. As with both boards in *Watkins* and *Leahy*, the Board's procedures for administrative hearings is governed by North Carolina's APA. *See* N.C. Gen. Stat. §

87-23(a) (2019) ("All of the charges [brought to the Board] shall be in writing and investigated by the Board. Any proceedings on the charges shall be carried out by the Board in accordance with the provisions of Chapter 150B of the General Statutes."). As our Supreme Court noted in *Watkins*, Section 150B-41 of our APA expressly provides "[a]n agency may use its experience, technical competence, and specialized knowledge in the evaluation of evidence presented to it." *Id.* § 150B-41(d) (2019); *Watkins*, 358 N.C. at 195, 593 S.E.2d at 767.

Accordingly, we look to the "composition and statutorily prescribed function" of the Board in the case *sub judice*. First, the Board consists of seven appointed members:

> [O]ne member from a school of engineering of the Greater University of North Carolina, one member who is a plumbing or mechanical inspector from a city in North Carolina, one licensed air conditioning contractor, one licensed plumbing contractor, one licensed heating contractor, one licensed fire sprinkler contractor, and one person who has no tie with the construction industry to represent the interests of the public at large.

N.C. Gen. Stat. § 87-16 (2019). The Legislature, in mandating the Board be comprised of licensed contractors from each industry the Board regulates as well as a licensing inspector and a member of a school of engineering, has demonstrated that it intended the Board have specialized knowledge and expertise. On 24 June 2018, the date of Petitioners' hearing, the Board was comprised of John Royal, a professional engineer and the Board's School of Engineering member, Robert Owens,

owner and operator of a consulting firm that specializes in construction and engineering, William Sullivan, a licensed HVAC contractor, and Stuart Schwartz, a licensed HVAC contractor and owner and operator of a HVAC contracting business.

In addition, the Board is "authorized by statute to develop rules and regulations to govern [Plumbing, Heating, and Fire Sprinkler Contractors.]" *See Watkins*, 358 N.C. at 195, 593 S.E.2d at 767. In 1931, the General Assembly created the Board "to promote the health, comfort, and safety of the people by regulating plumbing and heating in public and private buildings[ ]" upon the same principles "that the Legislature has required a license of physicians, surgeons, osteopaths, chiropractors, chiropodists, dentists, opticians, barbers, and others[.]" *Roach v. Durham*, 204 N.C. 587, 591, 169 S.E. 149, 151 (1933) (citations and quotation marks omitted). The General Assembly has directed, "to protect the public health, comfort and safety, the Board shall establish two classes of licenses[ ]" and further granted "[t]he Board shall prescribe the standard of competence, experience and efficiency to be required of an applicant for license of each class, and shall give an examination designed to ascertain the technical and practical knowledge of the applicant . . . ." N.C. Gen. Stat. § 87-21(b)(1),(3) (2019).

The General Assembly has "empowered [the Board] to administer, interpret, and enforce" its rules. *Watkins*, 358 N.C. at 195, 593 S.E.2d at 767. The Board is expressly authorized

> to revoke or suspend the license of or order the reprimand or probation of any plumbing, heating, or fire sprinkler contractor . . . who is guilty of any fraud or deceit in obtaining or renewing a license, or who fails to comply with any provision or requirement of this Article, or the rules adopted by the Board, or for gross negligence, incompetency, or misconduct, in the practice of or in carrying on the business of a plumbing, heating, or fire sprinkler contractor, or any combination thereof, as defined in this Article.

N.C. Gen. Stat. § 87-23(a); *see* 21 N.C. Admin. Code 50.0412(d) (2018) ("The Board may suspend or revoke a license where it is found that the licensee has failed to comply with the minimum standards of competence as set forth in 21 NCAC 50.0505(b).") The Board's rules provide "licensees shall design and install systems which meet or exceed our minimum standards of the North Carolina State Building Code, manufacturer's specifications and installation instructions *and standards prevailing in the industry*." 21 N.C. Admin. Code 50.0505(b) (2018) (emphasis added).

As the *Leahy* Court held the Nursing Board was "required to adopt standards regarding qualifications of applicants for licensure and to establish criteria which must be met by an applicant in order to receive a license[,]" *Leahy*, 346 N.C. at 781, 488 S.E.2d at 248, the Legislature has expressly delegated the authority to the Board here to "prescribe the standard of competence . . . required of an applicant for license of each class[.]" N.C. Gen. Stat. § 87-21(3). Accordingly, we are persuaded, under *Leahy* and *Watkins*, that the Board was not required to consider expert testimony related to the "manufacturers specifications and installation instructions and standards prevailing in the industry" as Petitioners contend.

- 12 -

In light of this holding, we now review the Record de novo to determine if the trial court erred as a matter of law in affirming the Board's conclusion Petitioners' installation was incompetent and in violation of the Board's regulations. At Petitioners' hearing, Jonathan Yerkes, Administrative Officer and Field Investigator for the Board, Mr. Mumtaz, the original general contractor on The Cooking Pot project, Ms. Ikuru, owner of The Cooking Pot, Michael Pickard, the contractor hired to finalize installation of the kitchen hood, Ingram, and Howard Longacre, a roofer hired by Ms. Ikuru's property management company, all testified before the Board.

The Record before the trial court established: Petitioners "completed the installation of the roof top unit, connect[ed] [it] to the existing duct work and installed some new duct work for the hood system in the kitchen." Ingram averred "[a]s far as the rain water leak coming from the area of the unit I installed, I state when installing I set the unit on top of the pre-existing platform." Ingram conceded he walked off the job prior to its completion. Ms. Ikuru informed the Board she has "continuously experienced water leaking in the area under where Petitioners installed the four ton unit." Yerkes testified to the contents of photographs provided by Ms. Ikuru. The photographs showed the new, four-ton HVAC unit placed on the existing pad and curb. Yerkes observed "no new pad and no new curb had been installed by Petitioners prior to the placement of the new HVAC system[,]" and the "existing pad and curbing were visibly cracked and not properly sealed so as to allow

- 13 -

water to come in through the roof." The general contractor, Mumtaz, testified that "the [HVAC] unit and curb don't match" and that "there was no flashing to alleviate leaking[.]" Additionally, Longacre examined and photographed the roof, reporting that the "HVAC unit had been placed on top of the curb which was allowing water to . . . enter the building . . . ." Longacre also performed a water test that indicated "[t]he cause of the leak is actually the new [HVAC] and curb."

From this evidence the Board determined Petitioners' work was incompetent in violation of N.C. Gen. Stat. § 87-23. The trial court reviewed and summarized this evidence in its Order and concluded this evidence supported the Board's determination. We agree. The Record reflects that Petitioners' installation of the HVAC unit caused The Cooking Pot to experience significant leaks. The Board, with its specialized knowledge and expertise, determined based on this evidence that Petitioners' conduct was incompetent and did not "meet or exceed the minimum standards of the North Carolina State Building Code, manufacturer's specifications and installation instructions and standards prevailing in the industry." 21 N.C. Admin. Code 50.0505(b). Although Petitioners contend passing inspection establishes competence, we emphasize, as the Board argues, Petitioners are required to also *meet or exceed* "manufacturer's specifications and installation instructions and standards prevailing in the industry." *Id.* We further agree with the trial court that the Board may use its expertise to evaluate the evidence before it, and accordingly,

we affirm the trial court's Order and conclude the Board did not err as a matter of law when it determined Petitioners were required to comply with "manufacturer's specifications and installation instructions and standards prevailing in the industry."

*B. Load Calculation*

Petitioners next contend the trial court erred in affirming the Board's conclusion that Petitioners were incompetent for failing to conduct an independent load calculation prior to installing the new HVAC unit. Petitioners cite the Board's regulation at 21 N.C. Admin. Code 50.0505(f), which states "[w]hen either a furnace, condenser, package unit or air handler in an existing residential heating or air conditioning system is replaced, the licensed HVAC contractor or licensed technician is required to perform a minimum of a whole house block load calculation." 21 N.C. Admin. Code 50.0505(f). Petitioners emphasize that this regulation applies only to *residential* HVAC units. The Board agrees with Petitioners that the regulation only applies to residential units; however, the Board contends that Petitioners' duty to conduct an independent load calculation comes from Petitioners' duty to "ensure that the contract is performed in a workmanlike manner and with the requisite skill and that the installation is made properly, safely and in accordance with applicable codes and rules." 21 N.C. Admin. Code 50.0505(a).

It is undisputed Petitioners relied on the building's original load calculations that were previously supplied to them. Our review of the Record indicates before the

renovation the building had a ten or twelve-ton HVAC unit on the roof. Because the space was being upfitted to include a kitchen, the new, four-ton HVAC unit was installed to service the kitchen. The Board received testimony from Yerkes stating "[one] can use [a] . . . certified engineered load calculation, but he would have to verify as a licensee that that load calculation is correct for what he's putting in, which would require him doing a load to ensure that that load is correct." Ingram conceded he did not verify the load calculation on which Petitioners relied.

The Board received testimony indicating that in order to perform the installation in a competent manner, a licensee would have to verify the load calculation to ensure it is correct. Additionally, the Board received evidence indicating that the building was old and had been previously occupied by an unrelated business. Accordingly, we conclude the trial court correctly determined Petitioners violated the duty to "perform work in a workmanlike manner and with the requisite skill and that the installation is made properly, safely and in accordance with applicable codes and rules." 21 N.C. Admin. Code 50.0505(a).

## II. Substantial Evidence

Petitioners next contend the trial court's Order affirming the Board's Order for HVAC installation and for license peddling is not supported by competent evidence. [**P's br. p 14**]. In reviewing Petitioners' claim, the trial court appropriately applied the whole-record test to determine if the Board's decision was supported by

substantial evidence. *See Watkins*, 358 N.C. at 199, 593 S.E.2d at 769. "A court applying the whole record test may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter *de novo*." *Id.* (citation and quotation marks omitted). "Substantial evidence is defined as relevant evidence a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations and quotation marks omitted).

### A. HVAC Installation

Petitioners contend the Board's conclusion that Petitioners' HVAC installation was incompetent is not supported by substantial evidence in the Record. Our review of the Record, as outlined *supra*, reflects the whole record supports the Board's determination that Petitioners' installation did not comply with the Board's regulations—specifically "manufacturer's specifications and installation instructions and standards prevailing in the industry"—and further that the Board was correct to use their professional expertise when assessing the evidence before it. Accordingly, the trial court properly concluded the Board's decision is supported by substantial evidence.

### B. White Oaks Manor Permit

Petitioners next contend the Board's conclusion that Petitioners were engaged in license peddling is not supported by substantial evidence. Petitioners challenge the Board's Finding of Fact 15, which provides:

> 15. With respect to the job at White Oaks Manor located at 401 N. Morgan St. Shelby N.C., the testimony supports the inference that [Petitioners] knowingly sent employees of a contractor licensed in South Carolina but not North Carolina to obtain the permit to install two mini-split HVAC systems. The testimony by [Ingram] that he had planned to carry out the work himself a week after sending employees of another firm to get the permit is not credible. Simple projects like installation of ductless heat pumps (mini splits) would ordinarily receive permit and installation the same day. There was no evidence that [Petitioners] completed the installation or obtained a final inspection. The Board did not place weight on the statement of the South Carolina personnel that [Petitioners] utilized individuals for licensed work who were not bona-fide employees of Commercial Controls and paid workers in cash or 1099's. Respondent's actions constituted license peddling.

Our review of the Record as it pertains to Petitioners' license peddling indicates there is substantial evidence to support the Board's Finding. Melton, Administrative Assistant for the City of Shelby Building Inspection Department, averred that two men, employed by Carolina Air, entered the Department on 13 June 2017 and attempted to obtain a permit for Petitioners. The men informed Melton they received 1099s from Petitioners. Melton denied the men a permit and attempted to reach their supervisor, Bill Bolin. When Melton contacted Bolin, she reported that he was "vague" and informed her that he received a 1099 from Petitioners. At Petitioners'

hearing, the Board heard testimony from David Boulay, an Administrative Officer and Field Investigator for the Board. Boulay began investigating Petitioners in 2017 after he received a complaint from Melton. Boulay testified that Bolin was evasive when he attempted to meet with him and that "[Bolin] actually said to me on the phone that he was paid [by Petitioners] with cash and 1099, and then [Bolin] later changed his statement, when he actually gave me a consent agreement, which he swore to, that he wasn't paid with cash or 1099."

Ingram averred that he had an agreement with Bolin "where they purchase the equipment and [he] install[s] it." He further stated "[Bolin] and his employees are not on my pay roll" and that he does not pay them for their time or labor. Ingram conceded he obtained the requested permits in person, but that he never completed any work pursuant to the permit and that no final inspection on the permits occurred. Ingram indicated he understood work could have been completed under the permit by another. Accordingly, we are satisfied by the whole record that there is substantial evidence in support of the Board's determination that Petitioners were engaged in license peddling in violation of 21 N.C. Admin. Code 50.0403. Thus, the trial court did not err in affirming the Board's decision.

## Conclusion

Accordingly, in light of the foregoing, the trial court's Order affirming the Board's Order suspending Petitioners' licenses for twenty-four months and ordering twelve months of supervised probation is affirmed.

AFFIRMED.

Judge ARROWOOD and Judge COLLINS concur.