IN RE: GARY JAMES LUSTGARTEN, M.D., Respondent

No. COA05-891

(Filed 6 June 2006)

**Physicians and Surgeons— discipline—testimony during medical malpractice trial—good faith**

The superior court erred by upholding a disciplinary order from the North Carolina Medical Board based on an accusation that respondent had testified in a medical malpractice action in bad faith. There was a good faith basis in the evidence for respondent's testimony that another doctor's medical note was not credible, and it is clear from the record that respondent was content to state no more than his opinion that the note was faulty until he was pressed on cross-examination. Defense attorneys introduced the words "falsified," "liar," and "lying."

Appeal by respondent Gary J. Lustgarten from judgment entered 18 April 2005 by Judge Donald W. Stephens in Wake County Superior Court. Heard in the Court of Appeals 9 March 2006.

*D. Todd Brosius and Thomas W. Mansfield for the North Carolina Medical Board, petitioner appellee.*

*Smith, James, Rowlett & Cohen, L.L.P., by Seth R. Cohen, for respondent appellant.*

McCULLOUGH, Judge.

Dr. Gary J. Lustgarten appeals from a superior court order affirming a disciplinary decision of the North Carolina Medical Board, which suspended Dr. Lustgarten's license for one year based upon the Board's finding that he had engaged in unprofessional conduct. For the reasons set forth herein, the superior court's order is reversed, and this case is remanded for dismissal of the disciplinary charges against Dr. Lustgarten.

## Facts

Dr. Gary J. Lustgarten is a board certified neurosurgeon licensed to practice medicine in Florida. He also has a license to practice medicine in North Carolina, though his North Carolina license has been inactive since 1998. On 25 April 2002, the North Carolina Medical Board filed a document charging Dr. Lustgarten with engaging in unprofessional conduct and alleging that he was subject to discipline pursuant to section 90-14(a)(6) of the General Statutes.

The charges against Dr. Lustgarten arose from his testimony for the plaintiffs in a medical malpractice case, *Hardin v. Carolina Neurological Services, et al.* The *Hardin* plaintiffs alleged that two neurosurgeons, Drs. Victor J. Keranen and Bruce P. Jaufmann, provided negligent treatment resulting in the death of a shunt-dependent patient with hydrocephalus, or "water on the brain," the condition that occurs when there is an enlargement of the ventricles of the brain.

Dr. Keranen had performed a surgical shunt revision on the patient, after which the patient was transferred to a recovery room. Shortly thereafter, the patient began to experience headaches and restlessness, and he eventually suffered cardiopulmonary arrest. As the patient's heath declined, Dr. Jaufmann was called in to treat him. Dr. Jaufmann checked the shunt and was unable to obtain a flow of cerebral spinal fluid. He therefore performed a surgical removal of the catheter inserted earlier by Dr. Keranen, and inserted a new catheter. According to a notation made by Dr. Jaufmann, the patient's cerebral fluid was not under increased pressure at the time this procedure was performed. Regrettably, despite Dr. Jaufmann's efforts, the patient died.

In pretrial deposition testimony given in the *Hardin* case, Dr. Lustgarten stated his opinion that the applicable standard of care required that (1) the shunt-dependent patient be transferred to intensive care or a "step-down" unit after surgery; (2) Drs. Keranen and Jaufmann

have an oral exchange of information concerning the patient before his care was turned over to Dr. Jaufmann; (3) the treating physician place a note in the patient's file indicating that the physician should be called if some untoward event occurred, and (4) the responsible physician place a telephone call to ask about the status of the patient before the physician went to bed. Dr. Lustgarten offered an opinion that these standards of care were not observed.

While being cross-examined by counsel for Drs. Keranen and Jaufmann, Dr. Lustgarten also stated that he had "difficulty believing" Dr. Jaufmann's notation that the patient's intracranial pressure was not elevated at the time that the second catheter was inserted. In support of his skepticism concerning the notation, Dr. Lustgarten provided the following reasons for his conclusion that the pressure had to be elevated: (1) after the initial surgery, the patient experienced headaches that did not respond to pain medication, and the patient had not experienced such headaches in the past; (2) the patient moved from an alert, oriented, and cooperative state to a more restless and agitated state; (3) a CAT scan, taken a few hours after Dr. Keranen operated, revealed that the ventricles in the patient's brain were practically the same size as they were in a CAT scan taken prior to that surgery; (4) when Dr. Jaufmann disconnected the catheter inserted by Dr. Keranen, he found that there was no ventricular drainage.

After articulating these observations, Dr. Lustgarten stated,

I have difficulty believing . . . the comment that Dr. Jaufmann made at the time . . . he passed the ventricular catheter . . . that the [spinal fluid] did not appear to be under abnormal or unusual pressure . . . . I believe that the [spinal fluid] was under pressure. And that nobody else who witnessed this recalls whether spinal fluid spurted out or not. Basically the only one who commented on that was Dr. Jaufmann.

Well, it is difficult for me to believe that the spinal fluid was not under pressure. I believe it was under pressure and that all the evidence before and after, including the CAT-scan that was done within 30 to 40 minutes after, was consistent with increased intracranial pressure.

So I believe that it was under pressure.

The following colloquy then ensued:

[DEFENSE ATTORNEY]: Okay. Are you saying that Dr. Jaufmann was lying at the time that he tapped the shunt and found no pressure?

. . . .

[DR. LUSTGARTEN]: I'll say that. You don't have to say that. I've met him. I'm looking at him and I'm not going to call him a liar. But on the other hand, he is covering for a partner and he runs into a situation where he knows somebody screwed up here and that he should have been called earlier by the nurses. And as indicated before, he is running into a meat cleaver. He is the recipient of a disaster that he didn't ask for, and which was not his fault. And with all due respect to older partners and the hospital, I think he tried to temporize his findings and write a note that was benevolent.

[DEFENSE ATTORNEY]: So in other words, you are saying you believe Dr. Jaufmann's notes in the records which indicate there was no increased intracranial pressure is [sic] a lie?

[DR. LUSTGARTEN]: Well, he didn't take the pressure, first of all. That's number one.

[DEFENSE ATTORNEY]: Correct.

[DR. LUSTGARTEN]: So he can't say what the pressure was.

[DEFENSE ATTORNEY]: He can say whether it was increased.

[DR. LUSTGARTEN]: I don't know if while he was putting in the patient's head was elevated or whether it was flat. But generally when a neurosurgeon puts a catheter into a ventricle he can recognize whether the fluid is increased. And a neurosurgeon who does that should accurately report what he finds. Dr. Jaufmann wrote a note that the pressure wasn't elevated. I have a great deal of difficulty believing that based upon the symptomatology of the patient that was manifested, knowing that it was an obstructed system, knowing that the CAT-scan done afterwards shows the ventricles to be just as large as they were before with other evidence of increased intracranial pressure, and the scan done the next day after that the ventricles were almost down to normal size. So yes, I have difficulty believing the pressure was normal.

After pursuing another line of the questioning, the defense attorney revisited the issue of whether Dr. Lustgarten believed that Dr. Jaufmann had been untruthful:

**IN RE LUSTGARTEN**

[177 N.C. App. 663 (2006)]

[DEFENSE ATTORNEY]: You are accusing, are you not, Dr. Jaufmann of falsifying medical records?

[DR. LUSTGARTEN]: I think a jury is going to have to interpret what the testimony is.

[DEFENSE ATTORNEY]: I'm asking.

[DR. LUSTGARTEN]: Dr. Jaufmann has his story. I can understand his story and why he may have said that. And as opposed to becoming a screaming maniac and kicking his feet and slamming things against the wall and yelling and screaming at nurses, he was trying to do the best for all people concerned, including the hospital, the nurses, his partner in treating this man, and I don't believe for an instant that this ventricular pressure was normal, no.

[DEFENSE ATTORNEY]: Then the answer—

[DR. LUSTGARTEN]: I think Dr. Jaufmann has his own agenda for saying that. He will have to answer to that and then the jury is going to have to believe who they believe.

[DEFENSE ATTORNEY]: Okay. The answer to my question is: Yes, you believe Dr. Jaufmann's notes was [sic] a falsification of the medical records, the note which indicates that there was no increased pressure?

[DR. LUSTGARTEN]: I'm saying I believe there was increased intracranial pressure, and the facts fit that.

This deposition testimony was discussed at the trial of the *Hardin* case during Dr. Lustgarten's cross-examination by defense attorneys.

Several years after Dr. Lustgarten testified in the *Hardin* case, the North Carolina Medical Board charged him with committing several specific instances of unprofessional conduct during his testimony in the *Hardin* case. Five of the charges of misconduct were premised upon allegations that Dr. Lustgarten had misrepresented the applicable standard of care for Drs. Keranen and Jaufmann and had improperly testified that these treating physicians failed to have a meaningful exchange of information about the patient. Another charge of misconduct was levied based upon an allegation that "Dr. Lustgarten testified in the absence of any corroborating evidence and in spite of evidence to the contrary, that a physician [Dr. Jaufmann] falsified medical records to protect his associate."

Following a hearing, the Board entered a 22 August 2002 order in which it found that Dr. Lustgarten had misrepresented the standards of care applicable in the *Hardin* case, had wrongfully stated that Drs. Keranen and Jaufmann had failed to have a meaningful exchange of information, and had testified that Dr. Jaufmann falsified a medical record with "absolutely no direct evidence to support this extremely serious allegation." The Board concluded that, with respect to each finding, Dr. Lustgarten had engaged in unprofessional conduct pursuant to section 90-14(a)(6) of the General Statutes, and the Board revoked his license to practice medicine in North Carolina.

Dr. Lustgarten appealed the Board's disciplinary order to the Wake County Superior Court. Following a hearing, the superior court entered an order which affirmed in part and reversed in part the Board's disciplinary order. Specifically, the court ruled that Dr. Lustgarten could not be disciplined for his testimony concerning the applicable standards of care or for offering his opinion that Drs. Keranen and Jaufmann did not have a meaningful exchange of information. However, the court upheld the Board's conclusion that Dr. Lustgarten had committed unprofessional conduct "when he repeatedly testified without an evidentiary or good faith basis that Dr. Jaufmann had falsified medical records." The court remanded the case to the Board for a determination as to the appropriate discipline for "testifying that Dr. Jaufmann falsified medical records."

On remand, the Board held a hearing and entered a 30 March 2004 order suspending Dr. Lustgarten's North Carolina medical license for a period of one year. Dr. Lustgarten again appealed to the Wake County Superior Court, which conducted a hearing and affirmed the Board's 30 March 2004 disciplinary order.

Dr. Lustgarten now appeals to this Court. In his primary argument on appeal, Dr. Lustgarten contends that the superior court should not have affirmed the Board's second order of discipline because there was no substantial record evidence that Dr. Lustgarten's testimony accused Dr. Jaufmann of falsifying a medical record without a good faith evidentiary basis.

### Legal Discussion

The North Carolina Medical Board is statutorily imbued with the authority "to regulate the practice of medicine and surgery for the benefit and protection of the people of North Carolina." N.C. Gen. Stat. § 90-2 (2005). The Board has the power "to deny, annul, suspend, or

revoke [the] license" of a license-holder found by the Board to have committed

> [u]nprofessional conduct, including, but not limited to, departure from, or the failure to conform to, the standards of acceptable and prevailing medical practice, or the ethics of the medical profession, irrespective of whether or not a patient is injured thereby, or the committing of any act contrary to honesty, justice, or good morals, whether the same is committed in the course of the physician's practice or otherwise, and whether committed within or without North Carolina.

N.C. Gen. Stat. § 90-14(a)(6) (2005). As such, the Board is an occupational licensing agency, which is governed by Article 3A of the North Carolina Administrative Procedure Act. *See* N.C. Gen. Stat. § 150B-2(4b) (2005) (" 'Occupational licensing agency' means any board . . . which is established for the primary purpose of regulating the entry of persons into, and/or the conduct of persons within a particular profession, . . . and which is authorized to issue and revoke licenses."); N.C. Gen. Stat. § 150B-38(a)(1) (2005) (providing that Article 3A applies to occupational licensing agencies). Therefore, a person seeking judicial review of a decision of the Board "must file a petition in the Superior Court of Wake County. . . ." N.C. Gen. Stat. § 150B-45 (2005).

"The review by a superior court of [the Board's] decisions . . . [is] conducted by the court without a jury." N.C. Gen. Stat. § 150B-50 (2005).

> [T]he court may affirm the decision . . . or remand the case . . . for further proceedings. It may also reverse or modify the agency's decision . . . if the substantial rights of the petitioner[] may have been prejudiced because the agency's findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional provisions;
>
> (2) In excess of the statutory authority or jurisdiction of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Affected by other error of law;
>
> (5) Unsupported by substantial evidence . . . in view of the entire record as submitted; or
>
> (6) Arbitrary, capricious, or an abuse of discretion.

N.C. Gen. Stat. § 150B-51(b) (2005).

As to matters of fact, the superior court must apply the "whole record test" and is " 'bound by the findings of the [agency] if they are supported by competent, material, and substantial evidence in view of the entire record as submitted.' " *Bashford v. N.C. Licensing Bd. for General Contractors*, 107 N.C. App. 462, 465, 420 S.E.2d 466, 468 (1992) (citations omitted).

> When the [superior] court applies the whole record test . . . it "may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter *de novo*." "Rather, a court must examine all the record evidence—that which detracts from the agency's findings and conclusions as well as that which tends to support them—to determine whether there is substantial evidence to justify the agency's decision." "Substantial evidence" is "relevant evidence a reasonable mind might accept as adequate to support a conclusion."

*N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 660, 599 S.E.2d 888, 895 (2004) (quoting *Watkins v. N.C. State Bd. of Dental Exam'rs*, 358 N.C. 190, 199, 593 S.E.2d 764, 769 (2004) and N.C. Gen. Stat. § 150B-2(8b) (2003)). However, "[i]f it is alleged that an agency's decision was based on an error of law[,] then a *de novo* review is required." *Walker v. N.C. Dept. of Human Resources*, 100 N.C. App. 498, 502, 397 S.E.2d 350, 354 (1990), *disc. review denied*, 328 N.C. 98, 402 S.E.2d 430 (1991).

"A party to a review proceeding in a superior court may appeal to the appellate division from the final judgment of the superior court. . . . The scope of review to be applied by the appellate court . . . is the same as it is for other civil cases." N.C. Gen. Stat. § 150B-52 (2005). Thus, this Court examines the trial court's order for errors of law; this " 'twofold task' " involves: " '(1) determining whether the [superior] court exercised the appropriate scope of review and, if appropriate, (2) deciding whether the court did so properly.' " *Eury v. N.C. Employment Security Comm.*, 115 N.C. App. 590, 597, 446 S.E.2d 383, 387-88 (citation omitted), *appeal dismissed and disc. review denied*, 338 N.C. 309, 451 S.E.2d 635 (1994).

In the instant case, Dr. Lustgarten challenges the following determination made by the Board:

> Dr. Lustgarten testified under oath that Dr. Jaufmann, in order to somehow protect Dr. Keran[e]n, falsified the procedure note, which indicated that [the shunt-dependent patient's] CSF did not appear to

be under increased pressure. Dr. Lustgarten had absolutely no direct evidence to support this extremely serious accusation.

The superior court ruled that this finding was supported by substantial evidence in the record. After careful review of the record, we conclude that the superior court erroneously affirmed the Board's determination, as the substantial record evidence does not permit an inference that Dr. Lustgarten made an entirely unfounded statement concerning Dr. Jaufmann's notes.

The evidence before the Board tended to show that, at the time of his deposition in the *Hardin* case, Dr. Lustgarten was of the opinion that the shunt-dependent patient's intracranial pressure had to be elevated. Accordingly, he stated under oath that he had "difficulty believing" Dr. Jaufmann's contrary notation. Dr. Lustgarten's skepticism was based upon CAT-scan results, mood changes in the patient, pain-medication-resistant headaches being experienced by the patient, and the lack of ventricular flow, each of which indicated to Dr. Lustgarten that the patient's intracranial pressure was necessarily elevated. These observations provided a good faith evidentiary basis for Dr. Lustgarten's opinion that Dr. Jaufmann's notation was not credible.

Further, the record is clear that Dr. Lustgarten was content to state no more than his opinion that Dr. Jaufmann's note was faulty. However, a defense attorney representing Dr. Jaufmann in the *Hardin* case repeatedly asked Dr. Lustgarten whether Dr. Jaufmann was lying. Dr. Lustgarten did not wish to answer this question, but he eventually stated that he was "not going to call [Dr. Jaufmann] a liar" but that, in his opinion, Dr. Jaufmann had "tried to temporize his findings and write a note that was benevolent." Further, when the defense attorney persisted by asking whether Dr. Lustgarten was "accusing . . . Dr. Jaufmann of falsifying medical records," Dr. Lustgarten responded that the issue would have to be decided by a jury and again indicated that he had difficulty believing Dr. Jaufmann's note.

In explaining these statements, Dr. Lustgarten continually noted that, in his opinion, the patient's pressure had to be elevated and the circumstances in which Dr. Jaufmann found himself were quite difficult:

[Dr. Jaufmann was] covering for a partner and he [ran] into a situation where he kn[ew] somebody screwed up . . . and that he should have been called earlier by the nurses. And as indicated before, he [was] running into a meat cleaver. He [was] the recipient of a disaster that he didn't ask for, and which was not his fault.

**IN RE LUSTGARTEN**

[177 N.C. App. 663 (2006)]

Dr. Lustgarten also noted that "nobody else who witnessed [Dr. Jaufmann examining the shunt] recalls whether spinal fluid spurted out or not. Basically the only one who commented on that was Dr. Jaufmann." Thus, Dr. Lustgarten explained the basis for his conclusion that Dr. Jaufmann had "temporize[d]" his findings by writing a "note that was benevolent." Moreover, at no point did Dr. Lustgarten actually state that Dr. Jaufmann had "falsified" a medical record or use the terms "liar" or "lying" to describe Dr. Jaufmann or his conduct. Rather, these terms were introduced by defense attorneys representing Dr. Jaufmann.

As the foregoing discussion demonstrates, Dr. Lustgarten did not testify that Dr. Jaufmann had "tried to temporize his findings and write a note that was benevolent" until pressed to do so on cross-examination, and the substantial evidence of record demonstrates that Dr. Lustgarten had a good faith basis for making the statement for which the Medical Board seeks to impose discipline. Further, no other evidence in the record supports the Board's decision. Therefore, the Board erred by finding that Dr. Lustgarten levied a groundless accusation, and the superior court erroneously applied the whole record test to affirm the Board's determination.

The superior court's order affirming the Board's discipline is reversed. Further, because proper application of the whole record test does not permit a Board finding that Dr. Lustgarten made a bad faith accusation concerning the falsification of a medical record, on remand the superior court shall order that the disciplinary proceedings against Dr. Lustgarten be dismissed.

Reversed and remanded.

Judges TYSON and ELMORE concur.