ELMORE, Judge.
 

 *652
 
 The issue on appeal is whether Kevin Gerity (petitioner) is entitled to relief under the Whistleblower Act, N.C. Gen.Stat. § 126-84
 
 et seq.
 
 Senior Administrative Law Judge Fred Gilbert Morrison, Jr. (ALJ) entered a final decision concluding that petitioner is not as he failed to prove any of the three elements of a claim. We conclude that petitioner failed to establish that he reported protected activity, and thus we affirm.
 

 I. Background
 

 In December 2013, the North Carolina Department of Health and Human Services (DHHS) decided to pursue termination of petitioner's employment, and petitioner subsequently submitted a letter of resignation. Petitioner filed the instant action in April 2014 alleging that he was threatened with discharge because he made reports that constituted protected activity under the Whistleblower Act. The events
 
 *653
 
 preceding, as set out in the ALJ's findings of fact, tend to show the following: Petitioner worked as an autopsy technician and autopsy facility manager at the Office of the Chief Medical Examiner (OCME), which is within the Division of Public Health (DPH) and ultimately under DHHS. In 2010, Dr. Deborah Radisch became Chief Medical Examiner and hired Dr. Clay Nichols for the position of Deputy Chief Medical Examiner. Dr. Nichols served as petitioner's supervisor.
 

 In May 2011, petitioner assisted Dr. Nichols in performing an autopsy on Terrell Boykin who presented with a gunshot wound to the head and was one of the apparent victims of a double homicide. An x-ray "was said to indicate what appeared to be the presence of an item in the brain." The x-ray was not produced at the hearing. Neither petitioner nor Dr. Nichols recovered a bullet from the brain or skull cavity during the autopsy. Petitioner asked Dr. Nichols if he should perform a second x-ray, and Dr. Nichols instructed petitioner it was not necessary. Dr. Nichols concluded the autopsy, instructed petitioner to release the body to law enforcement, and returned to his office. Despite Dr. Nichols's instruction, petitioner performed a second x-ray, which did not show the presence of an object in the brain, and then he released the body to law enforcement.
 

 As an autopsy technician, petitioner was responsible for cleaning the autopsy room. Petitioner testified at the hearing that the Boykin autopsy "was the last case on that table for that day[.]" Petitioner stated that after he washed the cutting board and started washing the coagulated blood off the autopsy bench, "an object appeared." He rinsed off the object, picked it up, and determined it was a round, whole bullet. Petitioner put it in an evidence bag and called the photographer, William Holloman, to return to the autopsy room. Petitioner explained to Holloman how he found the object and asked Holloman to photograph it. When Holloman refused, petitioner took a picture of the bagged object with his personal cell phone.
 

 Petitioner did not call Dr. Nichols to return to the autopsy room. Instead, he took the bagged object to Dr. Nichols's office, which was located on a different level in the building. Petitioner did not label the evidence bag or document where he found the object, but he told Dr. Nichols that he found it near the cutting board. Dr. Nichols took the bagged object but did not mention it in his autopsy report.
 

 On 28 July 2011, petitioner met with Dr. Radisch and informed her that the Boykin autopsy report "inaccurately stated the bullet exists and is not recovered." Dr. Radisch testified that she subsequently reviewed
 
 *654
 
 the preliminary autopsy report and the x-ray but did not discuss them with Dr. Nichols and did not follow up with petitioner.
 

 On 9 September 2011, Dr. Nichols sent petitioner an e-mail instructing him not to
 
 *591
 
 use his cell phone to "conduct outside business on OCME time." Dr. Nichols also stated, "[Y]our contempt for Dr. Radisch is palpable. This includes a long history of belligerence, snide remarks and on at least one occasion, openly confrontational [sic]." Dr. Nichols listed three training classes for petitioner to attend, and concluded, "I sincerely hope that we can use your years of experience in a constructive manner for a long time to come."
 

 Later that morning, petitioner e-mailed Dr. Radisch, OCME administrator Pat Barnes, and Dr. Lou Turner (Dr. Radisch's supervisor) stating, "I am formally requesting a follow up meeting to the conversation we had on July 28, 2011, in regards to the [Boykin] case I worked with Dr. Nichols." Petitioner continued, "The autopsy report released to the public states 'no bullet was recovered'. This disturbs me because I personally recovered the bullet in this case and personally handed it to Dr. Nichols, yet this is not reflected in the final report." Dr. Radisch forwarded the e-mail to Dr. Nichols but did not take any additional action.
 

 In September 2013, DHHS leadership learned that the State Bureau of Investigation (S.B.I.) was investigating the Boykin autopsy. Investigators interviewed petitioner regarding his role in the autopsy. Around the same time, the local media reported about understaffing and other problems at the OCME. As a result of information discovered during the S.B.I. investigation, the following month DHHS ordered an internal personnel investigation into the Boykin autopsy. According to DHHS's final report submitted to the ALJ, "Petitioner provided detailed information about the OCME's unwritten policies, protocols and practices for evidence collection." Additionally, he "acknowledged that an autopsy technician should call the pathologist back into the room upon finding evidence outside the body."
 

 In November 2013, DHHS terminated Dr. Nichols's employment. In December 2013, DHHS decided to pursue termination of petitioner's employment. On 6 December 2013, Dr. Turner delivered a pre-disciplinary letter to petitioner, which was signed by DPH Acting Division Director Danny Staley and stated, "This letter is to notify you that a pre-disciplinary conference has been scheduled for December 9, 2013, at 11:00 a.m.... The purpose of this conference is to ensure that the decision to be made is not based on misinformation and to give you an opportunity to respond."
 

 *655
 
 On 9 December 2013, petitioner, Mr. Staley, Dr. Turner, and DHHS Human Resources Manager Greg Chavez attended the pre-disciplinary conference. Mr. Staley began by stating, "This is your opportunity to give me your side of the story," and no decision has been made. Before addressing the content of the pre-disciplinary letter, petitioner presented a typed resignation letter addressed to Mr. Staley. In the letter, petitioner stated, "Please accept this letter of resignation effective today, December 9, 2013.... It is my intention to retire effective January 1, 2014." Mr. Staley accepted petitioner's resignation and sent him a letter that day to confirm. In April 2014, petitioner filed a petition for a contested case hearing alleging a violation of the Whistleblower Act. Petitioner filed a prehearing statement on 30 May 2014 stating the following:
 

 [Petitioner] was threatened with discharge and was constructively discharged from the Respondent because he made reports that were protected activity under the Whistleblower Act. These reports were on matters of public concern that involved (a) substantial and specific dangers to the public health and safety, specifically mishandling and incompetence of autopsies [sic] of murder victims by superiors or colleagues, (b) gross mismanagement, and (c) gross abuse of authority.
 

 On 7 January 2015, Senior Administrative Law Judge Fred Gilbert Morrison, Jr. heard arguments, and on 12 March 2015, he entered a final decision concluding that petitioner was not entitled to relief. Petitioner appeals.
 

 II. Analysis
 

 "It is well settled that in cases appealed from administrative tribunals, '[q]uestions of law receive
 
 de novo
 
 review,' whereas fact-intensive issues 'such as sufficiency of the evidence to support [an agency's] decision
 
 *592
 
 are reviewed under the whole-record test.' "
 
 N.C. Dep't of Env't & Natural Res. v. Carroll,
 

 358 N.C. 649
 
 , 659,
 
 599 S.E.2d 888
 
 , 894-95 (2004) (quoting
 
 In re Greens of Pine Glen Ltd. P'ship.,
 

 356 N.C. 642
 
 , 647,
 
 576 S.E.2d 316
 
 , 319 (2003) ). Under a
 
 de novo
 
 review, the reviewing court " 'consider[s] the matter anew[ ] and freely substitutes its own judgment for the agency's.' "
 
 Id.
 
 at 660,
 
 599 S.E.2d at 895
 
 (quoting
 
 Mann Media, Inc. v. Randolph Cnty. Planning Bd.,
 

 356 N.C. 1
 
 , 13-14,
 
 565 S.E.2d 9
 
 , 17 (2002) ). When applying the whole record test, however, the reviewing court " 'may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter
 
 de novo.
 
 ' "
 

 Id.
 

 (quoting
 
 *656
 

 Watkins v. N.C. State Bd. of Dental Exam'rs,
 

 358 N.C. 190
 
 , 199,
 
 593 S.E.2d 764
 
 , 769 (2004) ). If the "findings are supported by substantial evidence-that amount of evidence that a reasonable mind would accept as adequate to support a decision, the reviewing court must uphold the ... decision."
 
 N.C. Dep't of Corr. v. McNeely,
 

 135 N.C.App. 587
 
 , 592,
 
 521 S.E.2d 730
 
 , 733 (1999) (citing
 
 ACT-UP Triangle v. Comm'n for Health Serv.,
 

 345 N.C. 699
 
 , 707,
 
 483 S.E.2d 388
 
 , 393 (1997) ).
 

 The Whistleblower Act, codified at N.C. Gen.Stat. § 126-84
 
 et seq.
 
 (2015), provides,
 

 (a) It is the policy of this State that State employees shall be encouraged to report verbally or in writing to their supervisor, department head, or other appropriate authority, evidence of activity by a State agency or State employee constituting:
 

 (1) A violation of State or federal law, rule or regulation;
 

 (2) Fraud;
 

 (3) Misappropriation of State resources;
 

 (4) Substantial and specific danger to the public health and safety; or
 

 (5) Gross mismanagement, a gross waste of monies, or gross abuse of authority.
 

 N.C. Gen.Stat. § 126-84(a) (2015). Furthermore,
 

 [n]o head of any State department, agency or institution or other State employee exercising supervisory authority shall discharge, threaten or otherwise discriminate against a State employee regarding the State employee's compensation, terms, conditions, location, or privileges of employment because the State employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, any activity described in G.S. 126-84, unless the State employee knows or has reason to believe that the report is inaccurate.
 

 N.C. Gen.Stat. § 126-85(a) (2015).
 

 In order to succeed on a claim under the Whistleblower Act, a plaintiff has the burden of proving by a preponderance of the evidence the following three elements: "(1) that the plaintiff engaged in a protected activity, (2) that the defendant took adverse action against the plaintiff
 
 *657
 
 in his or her employment, and (3) that there is a causal connection between the protected activity and the adverse action taken against the plaintiff."
 
 Newberne v. Dep't of Crime Control & Pub. Safety,
 

 359 N.C. 782
 
 , 788,
 
 618 S.E.2d 201
 
 , 206 (2005).
 

 On appeal, petitioner claims that the ALJ erred in concluding that he did not engage in protected activity for two reasons. First, he argues no evidence supports the ALJ's conclusion that his 9 September 2011 e-mail was a "tit for tat." Petitioner contends that the Boykin autopsy report was inaccurate or fraudulent, without further explanation. Second, petitioner states that the Whistleblower Act applies if his employer retaliated based on a misapprehension that petitioner reported protected activity.
 

 We do not find merit in petitioner's first argument. Although petitioner takes issue with the ALJ's "tit for tat" theory, petitioner fails to present any argument on why the numerous other findings are not supported by substantial evidence or why the conclusions of law are in error. Likewise, petitioner does not present any argument on why his allegations constituted any one of the five protected activities under N.C. Gen.Stat. § 126-84 (2015). In the three-and-a-half pages petitioner devotes to discussing protected activity in his brief, he cites only one case, from California, on public policy. "It is
 
 *593
 
 not the duty of this Court to supplement an appellant's brief with legal authority or arguments not contained therein."
 
 Goodson v. P.H. Glatfelter Co.,
 

 171 N.C.App. 596
 
 , 606,
 
 615 S.E.2d 350
 
 , 358 (2005) (noting that the appellant "fail[ed] to cite any legal authority or even a legal definition of the term ratification in its brief to this Court").
 

 In its final decision, the ALJ concluded in part,
 

 8. After considering all of the evidence, it is found that Petitioner failed to show by a preponderance of the evidence that he found a whole bullet during the Boykin autopsy. Neither party produced the x-ray, the bagged object, or any photographs thereof, and the parties offered conflicting evidence on whether the bagged item consisted of a whole bullet, a bullet jacket, a bullet fragment, or something else. It is concluded that Dr. Radisch's description of the object as a "piece of copper projectile jacket" is more credible than Petitioner's description of a "whole bullet," particularly in light of the autopsy report which clearly describes a "gaping" exit wound.
 

 9. Even if the object Petitioner said he found was a whole bullet, it is not clear that Dr. Nichols' autopsy report
 
 *658
 
 was fraudulent or even inaccurate. Dr. Nichols prepared a thorough autopsy report that identified Mr. Boykin's cause of death and described in considerable detail the entry and exit wounds made by a bullet. Petitioner claims to have discovered a bullet and contends that the report was fraudulent because Dr. Nichols stated that a " bullet exists and is not recovered." But although Dr. Nichols' statement could be read as an assertion that no one at the OCME found a bullet, it could also be interpreted as a truthful assertion that Dr. Nichols did not personally find and recover a bullet and thus he could not verify or vouch for one's recovery. This interpretation is supported by the fact that the OCME had no rules for how pathologists should respond to items presented to them outside the autopsy room, likely because this situation had never arisen before.
 

 10. After considering all of the evidence, it is concluded that Petitioner's complaints about the Boykin autopsy primarily concerned his dissatisfaction with Dr. Nichols' job performance rather than fraud or a substantial and specific threat to public safety. Petitioner admitted that he did not trust Dr. Nichols and that he called Mr. Holloman to show him that Dr. Nichols' work was "sloppy." Dr. Nichols, in turn, obviously distrusted and was not always satisfied with Petitioner. The timing of Petitioner's complaints about the Boykin autopsy also suggest a kind of "tit for tat," with Petitioner complaining about Dr. Nichols' work in retaliation for Dr. Nichols' warnings about Petitioner's secondary employment and interactions with others.
 

 In sum, the ALJ concluded that "the greater weight of the evidence does not support a conclusion that Petitioner engaged in protected activity when he reported his concerns about the Boykin autopsy to his superiors at the OCME [.]" We agree.
 

 The evidence supports the ALJ's findings that petitioner knew under known protocol and work rules that he should have called Dr. Nichols, the pathologist, to return to the autopsy room so that Dr. Nichols could properly collect and bag any newly discovered evidence. It is evident from the record that petitioner and Dr. Nichols disagreed on what to do with the later-found object. However, Dr. Nichols's decision not to mention the object-presented to him in his office, after the autopsy ended,
 
 *659
 
 in an unmarked evidence bag, with no documented record of where it came from-in his autopsy report does not, as petitioner alleges, make the autopsy report fraudulent. N.C. Gen.Stat. § 126-84 (2015).
 

 Although the ALJ made additional remarks suggesting petitioner was complaining about Dr. Nichols due to Dr. Nichols's 9 September 2011 e-mail, we do not find it necessary to speculate as to petitioner's timing in reporting to Dr. Radisch-i.e., whether it was a "tit for tat." Instead, in analyzing the substance of petitioner's 28 July 2011 oral report and 9 September 2011 written report to Dr. Radisch, we conclude petitioner failed to establish by a preponderance of the evidence that he reported or was about to report protected activity.
 

 We address petitioner's second argument without reaching the merits. At the hearing,
 
 *594
 
 petitioner testified that an S.B.I. agent and Dr. Turner asked him if he spoke to the media regarding the Boykin autopsy. Although petitioner denied speaking to the media, he stated, "[I]t seemed to me I was being zeroed in on as far as being a leak."
 

 The ALJ addressed petitioner's allegation by stating that because petitioner did "not contend that he actually prompted the media reports or S.B.I. investigation ... there is no need to determine whether such behavior would qualify as protected activity under the Whistleblower Act." Later in the final decision, in discussing the third element of a claim and the absence of a retaliatory motive-assuming
 
 arguendo
 
 that petitioner satisfied the first two elements-the ALJ stated, "[E]ven if Petitioner could show that DHHS management sought his dismissal because they mistakenly believed him to be the source of the media and S.B.I. leaks, this would be insufficient to establish a claim under the Whistleblower Act."
 

 As the ALJ pointed out, our courts have not considered whether a "perceived whistleblower" is entitled to protection under the Whistleblower Act. However, this Court need not decide that issue today as it is not necessary to reach a conclusion in this case. For the reasons discussed above, because petitioner's reports to Dr. Radisch did not constitute protected activity under N.C. Gen.Stat. § 126-84 (2015), a perceived report of the same content to a different party (the S.B.I. or the media) would likewise not constitute protected activity.
 

 Because petitioner did not engage in protected activity, we need not address petitioner's arguments on the remaining two elements of a claim under the Whistleblower Act.
 

 *660
 

 III. Conclusion
 

 The ALJ did not err in determining that petitioner was not entitled to relief under the Whistleblower Act.
 

 AFFIRMED.
 

 Judges STROUD and DIETZ concur.