IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-562

No. COA20-869

Filed 19 October 2021

Office of Administrative Hearings, No. 20 OSP 01463

VELMA SHARPE-JOHNSON, Petitioner,

v.

NC DEPARTMENT OF PUBLIC INSTRUCTION EASTERN NORTH CAROLINA SCHOOL FOR THE DEAF, Respondent.

Appeal by Petitioner from final decision entered 28 September 2020 by Administrative Law Judge William T. Culpepper, III, in the Office of Administrative Hearings. Heard in the Court of Appeals 8 September 2021.

*Jennifer J. Knox for Petitioner-Appellant.*

*Attorney General Joshua H. Stein, by Assistant Attorney General Stephanie C. Lloyd, for Respondent-Appellee.*

COLLINS, Judge.

¶ 1 Petitioner Velma Sharpe-Johnson appeals from a Final Decision of the Office of Administrative Hearings affirming her dismissal from her position as an Educational Development Assistant by Respondent North Carolina Department of Public Instruction, Eastern North Carolina School for the Deaf. Petitioner argues that "the trial court err[ed] in determining that there was substantial evidence to prove that the Petitioner committed the alleged conduct[.]" Because substantial

evidence in the whole record supported the findings that Petitioner engaged in grossly inefficient job performance and unacceptable personal conduct, we affirm.

## I.  Procedural History

¶ 2        Respondent dismissed Petitioner from employment on 19 December 2019 and issued a final agency decision affirming the dismissal on 24 March 2020.  Petitioner timely filed a petition for a contested case hearing in the Office of Administrative Hearings.

¶ 3        On 28 September 2020, an Administrative Law Judge ("ALJ") issued a Final Decision affirming Respondent's dismissal of Petitioner.  Petitioner exhausted the agency processes to grieve the dismissal.  Petitioner timely gave notice of appeal to this Court.

## II.  Factual Background

¶ 4        The Eastern North Carolina School for the Deaf ("ENCSD") serves both day students and residential students.  Residential students arrive at the school on Sunday afternoon, remain on campus throughout the school week, and return home on Friday afternoon.  ENCSD operates bus routes to pick up residential students on Sundays and return them home on Fridays.  Each bus is staffed by two ENCSD Educational Development Assistants; one serves as the driver and the other as the bus monitor.  The bus monitor is responsible for recording departure times, arrival times, and student attendance in real time on a "route sheet."  The busses contain a

GPS supplied by the school that is supposed to blink red and beep if the bus exceeds 55 miles per hour.

¶ 5    Petitioner was a career state employee employed by ENCSD as an Educational Development Assistant. Petitioner's responsibilities included "[d]riving ENCSD vehicles for student transportation and maintaining a non-expired NCDMV operations license," "complet[ing] all necessary training regarding the operation of state vehicles," supervising students being transported, and "providing safe and secure travel to and from ENCSD."

¶ 6    In August 2019, Petitioner signed a "Statement of Understanding – 2019-2020" containing the following acknowledgements:

> I am aware that the NC DPI Education Services for the Deaf and Blind's Policy and Procedures Manual, NC DPI Policies and Procedures, [and] the OSHR State Human Resources Manual . . . [are] available to me on the ENCSD Intranet and/or the NC Dept of Public Instruction's website and/or upon request to my manager or Human Resources.
>
> I recognize that I am responsible for reading/viewing these policies and for making myself familiar/knowledgeable of all OSHR, ESDB, NC DPI policies as they may relate to my employment.
>
> I agree to conduct my activities in accordance with all Education Services for the Deaf and Blind's and DPI procedures and policies and understand that breaching these standards may result in disciplinary action up to and including dismissal.
>
> Web addresses to the aforementioned policies and procedure[s] have been provided to me during the Human

Resources, New Employee Orientation presentation. The Education Services for the Deaf and Blind Policies included a requirement that "[s]taff transporting students shall meet all the requirements and safety regulations of the Department of Motor Vehicles and the Department of Public Instruction."

¶ 7 Petitioner also participated in a training for ENCSD transportation staff at the beginning of the 2019-20 school year. At the training, Petitioner received a "North Carolina School Bus Driver Handout" which stated:

> According to G.S. 20-218(b):
>
> It is unlawful to drive a school bus occupied by one or more child passengers over the highways or public vehicular areas of the State at a greater rate of speed than 45 miles per hour.
>
> It is unlawful to drive a school activity bus occupied by one or more child passengers over the highways or public vehicular areas of North Carolina at a greater rate of speed than 55 miles per hour.

¶ 8 Debra Pierce, first shift transportation coordinator for ENCSD, received a phone call at approximately 3:00 pm on Friday, 22 November 2019, from a person who identified himself as Terry Grier. According to Pierce, the caller

> said he was calling out of concern, that there was a bus on I-40. He identified the bus as a white activity bus that had Eastern North Carolina School for the Deaf on the side, Bus Number 34. And he said it was going at a high rate of speed, occupied by one or more passengers.

The caller informed Pierce that he "was observing the bus going at a high rate . . . of

speed, between 80 and 85" and "at some points 90 to 95 miles per hour" with at least

two passengers on board the bus. In the video, the caller can be heard stating:

> I am riding down Interstate 40, this is activity bus number 34, it says that it's from the Eastern NC School for the Deaf, Wilson County, my speedometer . . . is averaging between 80 and 90 miles per hour, looks like there is a driver and at least two passengers on the van, it seems to be going pretty fast for an activity bus on the interstate.

¶ 9 Based on the time of the call and the direction of travel, Pierce concluded that the bus was en route to the final stop in Supply, North Carolina. Pierce knew that Petitioner, ENCSD employee Sheeneeka Settles, and a student passenger were on Bus 34 at that time. Pierce went to the office of Dr. Michele Handley, director of ENCSD, and called the bus cell phone. Settles answered the phone and confirmed that Petitioner was driving the bus.

¶ 10 According to the route sheet from 22 November 2019, Bus 34 left the stop in Warsaw, North Carolina at 2:32 pm with one student on board and arrived at the Supply stop at 3:49 pm. Pierce testified that the bus was not scheduled to arrive at the Supply stop until 4:15 pm.

¶ 11 On 2 December 2019, ENCSD placed Petitioner on investigatory leave with pay. That day, Pierce spoke with Petitioner. According to Pierce, Petitioner denied driving 80 to 85 miles per hour but "admit[ted] to speeding up a little over 55 to pass a vehicle that was in front of her" and acknowledged that one student was on the bus.

In a handwritten note on the bottom of the letter informing Petitioner of the investigatory leave, Petitioner wrote, "I was not going 80 mph, I pass and had to speed up to pass, and when I try to get back over the car speeded up and would not let me over . . . . I have [a] CDL and would not take that chance of losing my CDL."

¶ 12 During the investigation, on Friday, 13 December, Pierce drove Bus 34 on the same route that Petitioner had driven on Friday, 22 November. Settles rode with Pierce and completed the route sheet. Pierce departed the stop in Warsaw at 2:30 pm and arrived at the stop in Supply at 4:15 pm. Pierce also spoke with Settles during the investigation. According to Pierce, Settles indicated that she was looking out the window and not paying attention to Petitioner's driving, and that she did not see the GPS red light or hear the beeping.

¶ 13 Respondent held a predisciplinary conference on 18 December 2019 at which Petitioner insisted that she had not driven over 55 miles per hour. ENCSD dismissed Petitioner effective 19 December 2019 based on both grossly inefficient job performance and unacceptable personal conduct of "exceed[ing] a speed of 55 mph while operating a student and staff occupied" ENCSD activity bus, which violated N.C. Gen. Stat. § 20-218 and Education Services for the Deaf and Blind Policies, and created "the potential to cause death or serious bodily injury."

¶ 14 After Respondent's final agency decision upholding the dismissal, Petitioner filed a petition for a contested case hearing. Following a hearing, the ALJ found that

Petitioner had engaged in the alleged conduct by "operat[ing] ENCSD bus #34, traveling on Interstate 40, at a speed in excess of 55 miles per hour which is in violation of N.C.G.S. § 20-218(b)" and the Education Services for the Deaf and Blind Policies. The ALJ found that Petitioner's conduct amounted to grossly inefficient job performance and unacceptable personal conduct as follows:

> 21. . . . [D]riving at a speed that exceeds the set limit increases the risk that the driver will lose control of the vehicle while trying to adapt to changing road conditions. In turn, this increased risk creates further potential for death or serious bodily injury to the driver, the passengers entrusted to the driver's care, and everyone else sharing the road with him or her.
>
> 22. Petitioner's conduct of driving an ENCSD bus at a grossly excessive speed over the 55 miles per hour speed limit was a gross failure of Petitioner to perform her job requirements as specified by management. By Petitioner's own admissions, it was an expectation of her job not to exceed 55 miles per hour while driving a bus. . . .
>
> 23. Petitioner's driving of an ENCSD bus at an average speed in excess of 70 miles per hour for a distance of 90 miles and for a time period of 1 hour and 17 minutes created the potential for death or serious bodily injury to her fellow employee, Ms. Settles, members of the public, and a member of the ENCSD student population over whom Petitioner had responsibility.
>
> . . . .
>
> 26. Petitioner's conduct falls within the first category of unacceptable personal conduct. Given the inherent risks associated with Petitioner's conduct, most significantly, the increased risk of death or serious bodily injury to a member of the student population entrusted to her care, no

reasonable person should expect to receive a prior warning for such conduct.

27.  Petitioner's conduct falls within the second category of unacceptable personal conduct.  Petitioner's conduct was a violation of state law, to wit:  N.C.G.S. § 20-218(b), which makes it unlawful to operate a school activity bus occupied by one or more child passengers over the highways or public vehicular areas of North Carolina at a greater rate of speed than 55 miles per hour.

28.  Petitioner's conduct falls within the third category of unacceptable personal conduct.  By Petitioner's own admissions and testimony, she violated known or written work rules.  Petitioner repeatedly admitted that she was not to drive a bus more than 55 miles per hour during the performance of her work duties. . . .

29.  Petitioner's conduct falls within the fourth category of unacceptable personal conduct. . . .

. . . .

30.  Here, Petitioner's conduct had the potential to detrimentally impact Respondent's mission and legitimate interests of providing educational programs to deaf and hard of hearing students while simultaneously promoting their safety and wellbeing.

. . . .

31. . . . Petitioner's conduct of far exceeding the required 55 miles per hour speed limit while transporting a student was potentially detrimental to Respondent's mission and legitimate interests and, thus, was conduct unbecoming of a state employee and detrimental to state service.

The ALJ concluded that Petitioner's grossly inefficient job performance and unacceptable personal conduct amounted to just cause for dismissal and affirmed Petitioner's dismissal. Petitioner appeals.

## III. Discussion

¶ 15 Petitioner challenges the ALJ's finding that she engaged in the alleged conduct.

¶ 16 A career state employee subject to the North Carolina Human Resources Act may only be discharged "for just cause." N.C. Gen. Stat. § 126-35(a) (2020). "Determining whether a public employer had just cause to discipline its employee requires two separate inquiries: first, whether the employee engaged in the conduct the employer alleges, and second, whether that conduct constitutes just cause for the disciplinary action taken." *N.C. Dep't of Env't & Nat. Res. v. Carroll*, 358 N.C. 649, 665, 599 S.E.2d 888, 898 (2004) (quotation marks, brackets, and citation omitted). We review de novo the conclusion that an employer had just cause to dismiss an employee. *Id.* at 666, 599 S.E.2d at 898.

¶ 17 Where a party contends that a final decision was unsupported by substantial evidence, "the court shall conduct its review of the final decision using the whole record standard of review." N.C. Gen. Stat. § 150B-51(b)(5), -51(c) (2020). "Under the whole record test, the reviewing court must examine all competent evidence to determine if there is substantial evidence to support the administrative agency's

findings and conclusions." *Henderson v. N.C. Dep't of Hum. Res.*, 91 N.C. App. 527, 530, 372 S.E.2d 887, 889 (1988) (citation omitted). Substantial evidence "means relevant evidence a reasonable mind might accept as adequate to support a conclusion." N.C. Gen. Stat. § 150B-2(8c) (2020). Unchallenged findings of fact are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991).

¶ 18  Petitioner argues that there was not substantial evidence in support of the determination that she violated N.C. Gen. Stat. § 20-218 because Bus 34 was neither a "school bus" nor an "activity bus" as defined in N.C. Gen. Stat. § 20-4.01(27)(m) and (n). Petitioner's argument is misguided.

¶ 19  The ALJ found "that ENCSD bus #34 is a school activity bus as defined in N.C.G.S. § 20-4.01(27)(m)." A school activity bus is defined as "[a] vehicle, generally painted a different color from a school bus, whose primary purpose is to transport school students and others to or from a place for participation in an event other than regular classroom work." N.C. Gen. Stat. § 20-4.01(27)(m) (2020). A school bus is defined, in part, as "[a] vehicle whose primary purpose is to transport school students over an established route to and from school for the regularly scheduled school day . . . that is painted primarily yellow below the roofline. . . ." *Id.* § 20-4.01(27)(n).

¶ 20  Evidence presented at the hearing showed that the vehicle driven by Petitioner was "a white activity bus" that is "one of the shorter buses" that the school has. The words "Eastern North Carolina School for the Deaf" and the number "34" were visible

on the side of the bus.

¶ 21            Petitioner argues that because the bus was being used to transport a child home from the school, the bus did not fit the definition of an activity bus. Specifically, Petitioner argues that "[w]hile bus #34 looked like a school activity bus, its primary purpose was to transport students to and from school over an established route for their regularly scheduled school day." However, the evidence at the hearing was that the bus was being used to pick up residential students from various stops in southeastern North Carolina on Sundays, transport them to the school grounds where they resided until Friday afternoons, and then transport them back to southeastern North Carolina. At the time in question, Bus 34 was not being used to transport a student to and from school for the regularly scheduled school day but was instead being used to transport a student from their place of residence at the school to their place of residence at home, outside of the regularly scheduled school day, on a route which was approximately six and a half hours round trip. Furthermore, while an activity bus is a vehicle whose "primary purpose" is to transport students to and from events other than regular classroom work, nothing in the statute prohibits an activity bus from being used for other purposes, such as transporting a child to and from their residence for the week. There was substantial evidence in the whole record to support the ALJ's finding that Bus 34 was an activity bus as defined in section 20-4.01(27)(m).

¶ 22          Substantial evidence in the whole record otherwise supports the ALJ's findings that Petitioner engaged in unacceptable personal conduct and grossly inefficient job performance. Pierce testified, and the ALJ found, that Petitioner was driving Bus 34 with a coworker and student on board; the route sheets showed that Petitioner had completed the route 28 minutes faster than Pierce had; and the witness stated to Pierce that Bus 34 was being driven "at a high rate of speed, between 80 and 85 mph, and at some points going as fast as 90 to 95 mph[.]"[1] The ALJ further found that "for Petitioner to travel the 90 miles between the Warsaw stop and the Supply stop in 1 hour and 17 minutes on the day in question, she would have had to average a speed in excess of 70 mph the entire way." This finding was supported by the ALJ's official notice of the distance between the two stops, pursuant to N.C. Gen. Stat. §§ 150B-30 and 8C-1, Rule 201, which Petitioner does not appeal. Lastly, the ALJ found that "Petitioner's own admissions show that it was a requirement of her job and a known work rule that she was not to drive an ENCSD bus at a speed greater than 55 miles per hour." Because Petitioner does not challenge this finding, it is binding on appeal. *Koufman*, 330 N.C. at 97, 408 S.E.2d at 731.

¶ 23          Petitioner contends that "[a]t no time did the GPS monitor beep or flash on the route the Petitioner drove" on 22 November 2019. While Petitioner testified that the

---

[1] The ALJ also admitted the audio portion of the recording that the witness sent Pierce as a present sense impression pursuant to N.C. Gen. Stat. § 8C-1, Rule 803.

GPS monitor did not flash, Pierce, Handley, and Petitioner herself each testified that the GPS devices were unreliable. Though Settles testified that she did not see the GPS blinking or flashing to indicate that Petitioner was speeding, the ALJ also received evidence that Settles had been looking out the window of the bus and had no view of the speedometer.

Petitioner also attacks the credibility of the reporting witness' opinion that Petitioner reached speeds of 80 to 95 miles per hour, questions the weight the ALJ gave to the route sheets admitted into evidence, and contends that Respondent should have introduced other route sheets recorded on the Friday afternoon route. These arguments are unavailing because, "[l]ike the jury in a jury trial, the ALJ is the sole judge of the credibility of the witnesses and the weight to be given to the evidence as the finder of fact." *N.C. Dep't of State Treasurer v. Riddick*, 274 N.C. App. 183, 852 S.E.2d 376, 382 (2020). Moreover, a reviewing "court applying the whole record test may not substitute its judgment for the agency's as between two conflicting views, even though it could reasonably have reached a different result had it reviewed the matter *de novo*." *Watkins v. N.C. St. Bd. of Dental Examiners*, 358 N.C. 190, 199, 593 S.E.2d 764, 769 (2004).

## IV.  Conclusion

Substantial evidence in the whole record supported the ALJ's findings that Petitioner engaged in grossly inefficient job performance and unacceptable personal conduct.  The ALJ did not err by affirming Respondent's dismissal of Petitioner.

AFFIRMED.

Judges ARROWOOD and JACKSON concur.